# EXHIBIT B

COURT OF APPEAL
FIFTH APPELLATE DISTRICT
FILED
MAY 04 1992
KEVIN A. SWANSON, Clerk
by_____
Deputy

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>GARY LUTHER,<br><br>    Defendant and Appellant. | No. F016005<br><br>(Super. Ct. No. 046653)<br><br>O P I N I O N |

JIBSON
DOCKETED
MAY 0 6 1992
By L. Rowbal
No. 91DA0924

THE COURT*

APPEAL from a judgment of the Superior Court of Kern County, Gerald K. Davis, Judge.

Burkowski & Harbin and Jeffrey E. Harbin, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Roger E. Venturi and J. Robert Jibson, Deputy Attorneys General, for Plaintiff and Respondent.

--ooOoo--

---

*Before DIBIASO, Acting P.J., THAXTER, J., and BUCKLEY, J.

A jury convicted appellant, Gary Luther, of second degree murder[1] (Pen. Code, § 187).[2] The jury also found that Luther used a gun within the meaning of section 12022.5, subdivision (a). On appeal, Luther contends 1) the court committed instructional error and 2) he was denied effective assistance of counsel. We will affirm.

FACTS

Luther and his girlfriend, Tesha Hill, lived at Luther's residence in Bakersfield from August 1990 until December 14, 1990, when Hill moved out. During that time the victim, Jimmy Obert, and Luther were on friendly terms and Obert would visit the couple at their house.

After Hill moved out, Luther began accusing her of having a relationship with Obert. Around December 17, 1990, Hill heard Luther say that Obert was going to pay for what he had done. On the evening of December 23, 1990, while Hill was at Luther's house, Obert arrived at the house and knocked on the door. Luther initially reacted by placing a gun in his back pocket. He then put the gun in a case and placed it on a

---

[1] The abstract of judgment contains an obvious clerical error in that it erroneously indicates that Luther was convicted of first degree murder. We will direct the trial court to file a corrected abstract of judgment that properly reflects that Luther was convicted of second degree murder.

[2] Unless otherwise indicated all further statutory references are to the Penal Code.

2

dresser.[3] Instead of opening the door, Luther yelled out that no one was home and Obert left. Luther stated he was going to make Obert pay for breaking up his relationship with Hill. He repeated the threat later in the evening.

On December 24, 1990, at 3 p.m. Luther's friend, Scott Roussel arrived at Luther's house. Luther appeared depressed so Roussel offered to take care of his kids while Luther went for a ride. Luther left and returned an hour later. After Luther returned, he and Roussel smoked a marijuana cigarette.

At 5 p.m. Roussel saw Obert arrive at the house. Roussel did not see Obert enter the house because Roussel went into the bathroom to take a shower. As he was about to step in the shower he heard one of Luther's children yelling and knocking on the bathroom door. As Roussel exited the bathroom, he saw Luther standing in the kitchen and Obert lying on the ground.

Roussel asked Luther what happened. Luther replied that he had told Obert to get out and hit him. Roussel checked Obert's pulse while Luther called 911. However, Luther was incoherent so Roussel called 911 after Luther hung the phone up.

Highway Patrol Officer Richard Taggert was the first peace officer to arrive on the scene. Upon his arrival, Luther told Taggert that he hit Obert with a gun. He also told Taggert that he had placed the gun outside on a shelf. Taggert recovered

---

[3] While Hill lived with Luther, Luther kept the gun under a mattress in his bedroom. Luther told Hill on at least one occasion not to worry about the gun because it did not work.

3

the gun from a metal cabinet in the rear patio of the house. Taggert testified that, based on his experience, Luther did not appear to be intoxicated or unaware of his surroundings.

Sheriff's Deputy William Smallwood interviewed Luther at the house after the shooting. Luther told Smallwood he was lying on his bed when Obert arrived uninvited. Luther grabbed the gun from under the bed. Obert approached him in a combative manner and, in order to defend himself, Luther slapped Obert once with the gun. As Smallwood escorted Luther to a patrol car, Luther spontaneously stated that "[Obert] bought my wife with drugs."

At the sheriff's station, Luther indicated he was not feeling well because he drank some peppermint Schnapps and wanted some fresh air. Smallwood took him outside for a few minutes. Afterward, Smallwood returned Luther to the interview room where Luther laid down on two chairs and fell asleep.

Luther got up when Detective Randy Raymond and another detective entered the room. Luther claimed the shooting was an accident and that he only hit Obert. According to Luther, Obert went to Luther's house to get a dart board. Luther told Obert to leave. Instead of leaving, Obert came at Luther. Luther went into his bedroom and got his gun. He held the gun in his right hand as he hit Obert with it on the left side of the head. Luther heard a pop as he struck Obert. Luther also told Raymond that Obert did not hit anything as he fell to the ground and landed on his back. Obert was not armed with a weapon. Luther

4

further stated that he did not like Obert and that Obert had been "fucking" with Hill.

Luther said he consumed a pint of peppermint Schnapps. However, he appeared to be aware of his surroundings and did not appear to be under the influence of alcohol. Raymond asked Luther whether he was aware of his surroundings when he struck Obert. Luther responded that he knew what was going on and what he was doing at that time.

Dr. John Holloway autopsied Obert's body. He testified that the cause of death was a gunshot wound that entered Obert's body in the back, right side of the neck above the hairline. Besides the gunshot wound, Obert suffered three other injuries. These injuries were caused by blunt force trauma. One was located on the right side of the face, another in the front of the face and a third caused bruising to the left eye. The gunshot did not leave any residue or tattooing on the body as would have been the case if the gun had been fired from a very close distance. In Dr. Holloway's opinion the cause of death was the gunshot wound, and the manner of death was homicide.[4]

Greg Lowskowsky, a ballistics expert, testified that the gun was fired from more than one foot away.

---

[4] Sheriff's Deputy Don Morton testified that he found a baggie containing suspected marijuana and methamphetamine, suspected pay and owe sheets and $1,431.23 on Obert's body. The defense had an expert testify that Obert had a high concentration of methamphetamine in his blood at the time of his death.

Luther's son, Russell, testified for the defense. According to Russell, on December 24, 1990, Obert went straight into Luther's room and the men began to argue. He saw Obert walking out backwards swinging at Luther. Luther hit Obert with the gun. Five seconds later, Russell heard the gun go off.

Luther testified that on the afternoon of the shooting he bought a pint of peppermint Schnapps and went over to a friend's house.[5] Upon his return home, he smoked a marijuana cigarette with Roussel. When Obert arrived at the house, one of his children knocked on his bedroom door. As he came out of the bedroom, Obert was at the front door. Luther told him to get out. Obert started to walk toward Luther and Luther again told him to get out. Obert said he came to get a dart board that belonged to him and he started to walk to where the board was hanging in the living room. Luther got the gun from his bedroom. Luther showed Obert the gun and again told him to get out. Obert came at him with his hands in the air and they got into a scuffle. Luther hit Obert with the gun on the left side of the head and as he did he heard a pop. Obert fell backward against the bedroom door and fell down.

Luther had owned the gun for nine years but he had never fired it. Luther did not intend to shoot Obert. He did not think the gun was operable. Luther only brought the gun out

---

[5]    Luther's friend and his wife drank part of the pint.

to scare Obert. He denied hitting Obert except once on the left side of Obert's head.

While discussing jury instructions, the court refused the defense's request to instruct the jury with CALJIC No. 4.35 (Ignorance Or Mistake Of Fact). In so doing, the court held that under People v. Goodman (1970) 8 Cal.App.3d 705 this instruction should only be given when the defendant's sole defense is that did not know the gun was loaded. The court further noted that the instruction "was pretty well covered in other instructions" and that it would only confuse the jury. The court did, however, charge the jury with CALJIC Nos. 5.00 (Excusable Homicide--Lawful Act) and 8.46 (Due Caution And Circumspection--Defined).

Also, the defense withdrew a request that the court instruct the jury on diminished capacity based on involuntary intoxication (CALJIC Nos. 4.21 and 4.22). In explaining the reason for doing so, defense counsel stated, "My analysis of the case and the evidence that came out of the case was that although Mr. Luther had imbibed in some Peppermint Schnapps and had smoked a joint of marijuana with his tenant or the person that was in the house with him, not the children, but the girl, the person in the house with him was nebulous. He didn't show any intoxication effects with any of the police officers, although they did smell alcohol on his breath. [¶] He didn't act as a person in an intoxicated manner, and I think bringing in jury instructions that don't relate to the facts is not good strategy for the defense. [¶] I think if you ask for instructions that are not

supported by the facts, you are asking for problems and, therefore, I do not want those given."

## DISCUSSION

Luther contends the court committed reversible error by its failure to instruct the jury with CALJIC No. 4.35. We will find that the court erred as Luther contends, but that the court's error did not prejudice Luther.

The trial court must give requested instructions on defenses where there is substantial evidence to support them. (People v. Flannel (1979) 25 Cal.3d 668, 685.) Substantial evidence is defined as evidence which is "sufficient to 'deserve consideration by the jury, i.e., "evidence from which a jury composed of reasonable men could have concluded"' that the particular facts underlying the instruction did exist." (People v. Wickersham (1982) 32 Cal.3d 307, 324, quoting People v. Flannel, supra, at pp. 684-685, fn. 12.) Further, if a trial court erroneously fails to give a requested instruction "[t]he only analysis permitted is to determine if the omitted issue was decided adversely to appellant by the jury in another context. [Citation.] As was stated in People v. Stewart (1976) 16 Cal.3d 133, 141 . . .: '[A] failure to instruct where there is a duty to do so can be cured if it is shown that "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions."'" (People v. Anderson (1983) 144 Cal.App.3d 55, 63.)

8

CALJIC No. 4.35 states,

"An act committed or an omission made in ignorance or by reason of a mistake of fact which disproves any criminal intent is not a crime.

"Thus a person is not guilty of a crime if [he] [she] commits an act or omits to act under an honest [and reasonable] belief in the existence of certain facts and circumstances which, if true, would make such act or omission lawful."

In People v. Goodman, supra, 8 Cal.App.3d 705 the defendant's defense to a charge that he murdered his wife was that the shooting was accidental. In one statement the defendant claimed that when he pointed a .12 gauge shotgun at his wife and pulled the trigger, he did not know the gun was loaded. In another statement he claimed the shotgun slipped from his grasp and discharged as he grabbed for it.

The trial court refused the defendant's request to instruct the jury with CALJIC No. 4.35. On appeal, this court held the court erred in so doing. In pertinent part we stated, "[A]ppellant contends that since his defense was that he did not know the gun was loaded, the court erred in not giving his proffered instruction, [CALJIC No. 4.35] that an act committed under a mistake of fact disproves criminal intent, and that a person who commits an act or omits to act under an honest and reasonable belief in the existence of certain facts and circumstances which, if true, would make such act and omission lawful, is not guilty of a crime. <u>The instruction should have been given as it was consonant with appellant's theory of the</u>

9

case--it was his sole defense." (<u>People</u> v. <u>Goodman</u>, <u>supra</u>, 8 Cal.App.3d at p. 709, emphasis added.)[6]

Nevertheless, we found that the court's error did not prejudice the defendant because the court charged the jury with other instructions that the killing was not unlawful if it was committed by accident. (<u>People</u> v. <u>Goodman</u>, <u>supra</u>, 8 Cal.App.3d at p. 709.)

Here, Luther contended he did not know the gun was operable and only retrieved it to scare Obert into leaving. Luther also contended he did not strike Obert until Obert advanced toward him in a menacing manner. Thus, CALJIC No. 4.35 was consonant with Luther's theory of the case. Under <u>Goodman</u>, the court erred by its refusal to charge the jury with this instruction.

However, here, as in <u>Goodman</u>, the court instructed the jury on due caution and circumspection (CALJIC no. 8.46)[7] and that "[t]he unintentional killing of a human being is excusable and not unlawful when committed by accident and misfortune in the

---

[6] The basis of our holding was that the defense was consistent with the defendant's theory of the case. Although we noted that it was the sole defense, we did so only to 1) emphasize that the defendant did not present any defense which was inconsistent with the proffered instruction and 2) underscore the significance of the court's error.

[7] This instruction charges the jury that to find a defendant acted without due caution and circumspection it must "appear that the death was not the result of inattention, mistaken judgment or misadventure, but the natural and probable result of an aggravated reckless or grossly negligent act."

performance of a lawful act by lawful means . . . ." (CALJIC No. 5.00.) In accord with these instructions, if the jury believed the shooting was accidental, it would have acquitted Luther of all charges. The fact that it did not indicates the jury determined this issue -- i.e., whether the shooting was accidental, adversely to Luther. The court's failure to instruct the jury with CALJIC No. 4.35 did not prejudice Luther.

### The Ineffectiveness of Counsel Claim

Luther contends he was denied effective assistance of counsel because his defense counsel failed to investigate a diminished capacity defense based on depression or voluntary intoxication. We will reject this contention.

"The burden of proving ineffective assistance of counsel is on the defendant. [Citation.] To establish constitutionally inadequate representation, the defendant must show that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's deficient representation subjected the defense to prejudice, i.e., there is a reasonable probability that but for counsel's failings the result would have been more favorable. [Citations.] When a defendant makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation. If the record sheds no light on why counsel acted or failed to act in the manner challenged, 'unless counsel was asked for an explanation and

11

failed to provide one, or unless there simply could be no satisfactory explanation' [citation], the case is affirmed [citation]. In such cases, the ineffective-assistance claim is more appropriately made in a petition for habeas corpus. [Citations.]" (People v. Babbitt (1988) 45 Cal.3d 660, 707.)

Here, the record does not indicate whether defense counsel investigated a diminished capacity defense based on either voluntary intoxication or depression.[8] Thus, Luther's ineffective assistance of counsel claim is more appropriately made in a petition for habeas corpus.

### DISPOSITION

The trial court is directed to prepare a corrected abstract of judgment that reflects Luther was convicted of second degree murder and to forward a certified copy of said corrected abstract of judgment to the Department of Corrections. As so modified, the judgment is affirmed.

---

[8] In view of this, Luther misplaces his reliance on In re Cordero (1988) 46 Cal.3d 161 to argue that his defense counsel was ineffective as a matter of law for failing to investigate a diminished capacity defense. In Cordero, the Supreme Court found that defense counsel was ineffective for failing to investigate a diminished capacity defense based on voluntary intoxication. However, it did so only after a referee conducted a hearing on the defendant's petition for a writ of habeas corpus which raised the issue. Thus, unlike the instant case, the court had a full record devoted to this issue from which to assess whether counsel's actions denied the defendant effective assistance of counsel.