Case 3:07-cv-04214-MHP  Document 3-4  Filed 11/20/2007  Page 1 of 7

# EXHIBIT C

LIFE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
AUGUST 2001 CALENDAR

LUTHER, GARY                                                                E-98605

I. **COMMITMENT FACTORS:**

    A.    **LIFE CRIME:** Murder Second, (H) Weapon, Use of Firearm, Penal Code 187, and Penal Code 12022.5(A), Kern County Court Case Number SC044653A. Victim: James William Obert, age 31, non-relative. Received by Department of Corrections on 06/07/91, Sentenced to 18 years to Life. MEPD is 09/29/02.

        1.    **Summary of Crime:** On December 24, 1990, at approximately 5:25 p.m., a California Highway Patrol unit was dispatched to East Haroling Avenue in Oildale, CA in reference to a possible injury accident. Upon arrival, Officer Taggert contacted suspect Luther who advised that he had hit victim Obert with a gun, then placed the gun outside on a shelf. While speaking with Luther, Officer Taggert observed that the suspect was quite upset and crying. Kern County Deputy Smallwood interviewed suspect Luther who stated that while lying on his bed, victim Obert arrived at the residence uninvited. Luther grabbed a gun that he had had for approximately nine years, showed the victim the gun, then told him to get out. Luther advised that victim Obert charged him in a combative manner and, to defend himself, he struck victim Obert with the gun. He indicated that Obert fell to the floor and that he called 911 for emergency. He then threw the gun in the patio area of the residence where Officer Taggert later located it. Suspect Luther was placed in custody and transported to the Sheriff's Department for questioning. Luther was advised of his rights which he declined to waive. However, he made the statement to the deputy that victim Obert "bought my wife with drugs." While in custody, he requested to go outside for fresh air as he had drank a pint of Peppermint Schnapps just prior to the incident and needed fresh air. He was allowed to go outside, in the company of the deputy, then returned into the interview room where he fell asleep until the arrival of the investigating detectives. He then made unsolicited statements to the detectives such as "it was an accident. All I did was hit him with the gun. I didn't shoot him. I slapped him." "I didn't like the guy. He's been fucking with my girlfriend, Tesha Hill." He was again advised of his Miranda rights and decided at that time to answer questions. He stated that one of his children had alerted him that Obert had come into the residence. Upon seeing Obert, he told him to "Get out of my house." He then told the detectives that he had owed the victim $200.00 for drugs and that Obert had possibly come to the residence to collect the debt. Luther was advised that he was under arrest for murder and was transported to the

LUTHER, GARY        E-98605        CTF-SOLEDAD        AUG/2001

Kern County Jail. Victim Obert was transported to Memorial Hospital where he was determined to be dead. A baggie containing 14.51 grams of marijuana and a baggie of 1.71 grams of chunky substance were taken from the victim's pants. Also found in the victim's wallet was $1,431.23 in currency and two "pay and owe sheets." Cause of death was from a gunshot wound to the head that entered Obert's body in the back, right side of the neck above the hairline. Obert also sustained blunt force trauma to the right side of the face, another in the front of the face and a third causing bruising to the left eye. Obert was found to have a high concentration of methamphetamine in his blood at the time of his death. (Sources: Kern County Probation Officer's Report dated May 14, 1991, Appeal dated May 6, 1992, No. FO16005).

2. **Prisoner's Version**: Inmate Luther was interviewed on 06/01/01 regarding the incident. Inmate Luther gave the following account: On 12/24/90, Luther left his residence for the purpose to purchase "some weed." He stopped at a liquor store and bought a pint of Peppermint Schnapps, then drove to the friends house where he smoked a joint. He then returned to his residence. At approximately 5:00 p.m., the victim came into Luther's residence and walked into the bedroom. Luther stated that "I told him to get out, then reached for my gun when he went into the living room. He then came back in. I took the gun and pointed up the ceiling and told him to get the fuck out of my house." Luther claims to have struck the victim across the face with an open hand while holding the gun, then grasped the gun. "That's when the gun went off." He stated that he thought that the gun had knocked the victim unconscious; that he wasn't aware that Luther was shot until his friend Roussel rolled the victim over. He then called 911 and, because he panicked, emptied the gun and tossed it into the patio area.

When asked why he felt he was in danger when the victim came to his home, Luther explained that they had had animosity between them stemming from a breakup with a girlfriend who had then become involved with victim Obert while living with Luther. Additionally, Luther admitted to having purchased methamphetamines from the victim and was in debt $200.00 to Obert.

Luther advised this writer that upon learning his girlfriend was involved with the victim, he broke off the relationship. A few days later, she returned and attempted to reconcile with him. He stated that he told her to leave. She left, slamming the door on the way out. He then stated that he kicked her vehicle because she angered him by slamming his door. He also admitted knocking her glasses on the ground, then stepped on them,

breaking them. He speculated that she may have told the victim about this behavior, causing Obert to come uninvited to his home.

He also disclosed that he owed the victim money for drugs and that after this incident occurred, he told the victim that he was not going to pay him. When asked by this writer why he made that decision, he responded that he had lost his trust in Overt. He stated that he told the dealer he would pay him but not the victim "because there was no trust thing. He was going behind my back."

Luther stated that his defense attorney did not want him to disclose any of the above because of defense strategy. He further stated that he regretted his decision to listen to her, that he disclosed more in this interview than he did at trial. Inmate Luther expressed regret and remorse for his actions. He stated that "I never meant to hurt or kill nobody. I would never own a gun again ever if I could." "The mistake I made was picking up the gun. I could have resolved it in a different fashion where we would not have had this outcome. His family, his children have all been hurt. Just as my family and kids have been hurt." He expressed that he was " flabbergasted that I was convicted" because the victim "was the aggressor."

B. **AGGRAVATING/MITIGATING CIRCUMSTANCES**: (Per D.O.M. 62090.11.2.11, Title 15 CCR 2404)

1. **Aggravating Factors**:

   a. Circumstances of the crime created potential for serious injury to others other than the victim of the crime.
   b. Use of weapon (firearm).
   c. Use of alcohol in crime.

2. **Mitigating Factors**: (Per D.O.M. 62090.11.2.11, Title 15 CC 2404)

   a. Minimal Arrest History.

II. **PRECONVICTION FACTORS**:

A. **Juvenile Record**: None noted.

B. **Adult Convictions**: Subject's criminal history began in 1978 with a misdemeanor arrest for Drunk Driving on Highway which was acquitted by jury. He was then arrested for fighting in public and battery on person. He was

convicted of fight/noise/offensive words and the battery was dismissed. In January of 1989, Subject was arrested and convicted of driving under the influence of alcohol. On 04/01/89, he was once again arrested and convicted of drunk driving. He was sentenced to three years Court Probation, thirty days jail, and eighteen months suspended license. On 06/03/89, Luther was arrested for vehicle code violations. On December 1990, subject was arrested for Murder: First Degree and was eventually convicted of Murder: second degree-use of firearm.

C. **Personal Factors**: Luther was born to parents George and Edith Luther of Bakersfield, CA. He was the third child and has a brother and a sister. The subject claims to have completed high school, graduating in 1977 from North High School. His childhood was uneventful.

Luther stated that he began using illicit drugs at age 17. He used cocaine on occasional basis and crank for about three to six months. He admitted to use of marijuana for years on an average of three times per week.

Subject married Elaine Webb and divorced eight years later. Three children were born of this union. Luther claimed to have custody of the three children at the time of the offense. Luther's employment history consisted of sporadic general labor for Ralph Schwebel Plastering Company between 1987 and 1989. He worked for Elam Tractor Rental as a truck driver for approximately six months in 1988. he also received AFDC benefits until after September, 1990. He earned a salary remodeling his father's home in 1990 and 1991. Luther does not recall anything remarkable of his childhood. He advised that his parents are good people and that they have been supportive of him.

III. **POSTCONVICTION FACTORS**:

A. **Special Accommodations/Disability**: None.

B. **Custody History**:

C. **Therapy & Self-Help Activities**: Subject has participated in AA consistently throughout his incarceration.

D. **Disciplinary History**: He has maintained a disciplinary-free record throughout his incarceration.

IV. **FUTURE PLANS**:

A. **Residence:** Luther advised that he will be residing with his parents at 222 E. Harding in Oildale, Ca. He stated that he will be adding on to the current property for his own residence while living with his parents. He stated that he will provide letters of support from his parents stating that information. He added that he will build a garage where the living quarters will be on top because "I will never live in a home where anyone could just walk in."

B. **Employment:** Luther stated that he would be employed by Ralph Schwebel Plastering Company and that he would present a letter of promised employment for the Board of Prison Terms.

Relative to community resources, Luther stated that he intends to attend church regularly. His opinion is that although he attends AA meetings, he doubts that he will attend upon release because he believes he gains far more from his belief in God. Therefore, his plan is to enhance his church involvement upon release.

V. **USINS STATUS:**

VI. **SUMMARY:**

A. Considering the commitment offense, prior record, and prison adjustment, this writer believes the prisoner would probably present a moderate degree of threat to the public at this time, if released from prison. Though the inmate has been described as a liable and responsible worker, his tendency to describe the shooting as accidental is indicative of not accepting responsibility for his actions. Of concern to this writer is that fact that the inmate was under the influence of alcohol and marijuana when this incident occurred. He acknowledges that his behavior stemmed from years of drug and alcohol use. Whether or not the inmate admits to the crime, the admission is with his justification that the victim entered his home, uninvited. He also stated that he was under the belief that "a man's home is his castle" and that he had a right to defend it, himself, and his children.

B. Prior to release, the prisoner could benefit from maintaining a disciplinary-free record, participating in an anger management program and continue participation in AA. This writer also recommends participation in CTF's Victim Impact Program to develop insight in his behavior.

C. This Board report is based upon two hours of interview, incidental contact in housing unit and review the Central File.

LIFE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
AUGUST 2001 CALENDAR

_____
M.Y. Cross
Correctional Counselor I


_____
R. Leach
Correctional Counselor II


_____
I. Guerra
Facility Captain


_____
D. S. Levorse
Classification and Parole Representative


LUTHER, GARY                                    CTF-SOLEDAD                    /2001