# EXHIBIT E

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )          CDC Number E-98605
)
GARY LUTHER )
)
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JANUARY 10, 2006

10:50 A.M.

PANEL PRESENT:

Mr. Jack Garner, Presiding Commissioner
Ms. Noreen Blonien, Deputy Commissioner

OTHERS PRESENT:

Mr. Gary Luther, Inmate
Ms. Catera E. Rutledge, Attorney for Inmate
Correctional Officers, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No      See Review of Hearing
_____  Yes     Transcript Memorandum

**P. M. LaChapelle, Peters Shorthand Reporting**

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 8 |
| Pre-Commitment Factors | 13 |
| Post-Commitment Factors | 23 |
| Parole Plans | 21 |
| Closing Statements | 39 |
| Recess | 45 |
| Decision | 46 |
| Adjournment | 53 |
| Transcriber Certification | 54 |

--oOo--

1

| 1 | **P R O C E E D I N G S** |
|---|---|

2      **DEPUTY COMMISSIONER BLONIEN:**    Okay,

3  we're on tape.

4      **PRESIDING COMMISSIONER GARNER:**  Okay.

5  This is a Subsequent Parole Consideration

6  Hearing for Gary Luther, L-U-T-H-E-R, CDC Number

7  E like Edward, 98605.  Today's date is January

8  10, 2006.  The time is 10:50 a.m., and we're

9  located at the Correctional Training Facility in

10  Soledad.  The inmate was received was June 7,

11  1991, from the County of Kern.  The offense was

12  murder in the second degree.  The Case Number is

13  E Edward 98605 (sic), Count Number 1, Penal Code

14  section 187, second degree.  The term was 15 to

15  life.  The minimum eligible parole date was

16  September 29, 2002, and the date that the life

17  term started was September 29, 1992.

18  This hearing is going to be tape-recorded, and

19  for purposes of voice identification for the

20  transcriber, I'm going to ask the participants

21  to identify themselves, first name, last name,

22  spelling the last name and Mr. Luther, when we

23  get to you, if you'd give us your CDC Number.

24  I'll start and go to my left.  I'm Jack Garner,

25  G-A-R-N-E-R, Commissioner.

26      **DEPUTY COMMISSIONER BLONIEN:**  I'm Noreen

27  Blonien, B-L-O-N-I-E-N, I'm a Deputy

2

1  Commissioner.

2      **ATTORNEY RUTLEDGE:**  Catera (phonetic) E.

3  Rutledge, R-U-T-L-E-D-G-E, attorney for Mr.

4  Luther.

5      **INMATE LUTHER:**  Gary Luther, E-98605.

6  Luther, L-U-T-H-E-R.

7      **PRESIDING COMMISSIONER GARNER:**  Thank

8  you.  Also for the record, we have two

9  Correctional Peace Officers in the room for

10  purposes of security.  Ms. Rutledge, I have a

11  BPT 1073 ADA form and it's signed by Mr. Luther

12  on December 20, 2004, indicating he does not

13  have a disability other than that he does use

14  eyeglasses, which I do note today that you're

15  wearing for reading purposes, sir?

16      **ATTORNEY RUTLEDGE:**  I had (indiscernible)

17  for everyday.  I'm nearsighted.

18      **PRESIDING COMMISSIONER GARNER:**  All

19  right.  Have there been any changes or other

20  accommodations that we need to do since December

21  of 2004?

22      **ATTORNEY RUTLEDGE:**  (indiscernible -

23  coughing)

24      **PRESIDING COMMISSIONER GARNER:**  Okay.

25  Thank you.  This Hearing is being conducted

26  pursuant to Penal Code sections 3041 and 3042

27  and the rules and regulations of the Board of

3

1   Parole Hearings governing Parole Consideration

2   Hearings for life inmates.

3   The purpose of today's Hearing is to consider

4   your suitability for parole.  In doing so, we

5   will consider the number and nature of the

6   crimes you were committed for, your prior

7   criminal and social history and your behavior

8   and programming since your commitment.  We've

9   had the opportunity to review your Central File

10  and your prior Hearing transcript.  You'll be

11  given an opportunity to correct or clarify the

12  record.

13  We'll consider your progress since your

14  commitment and since your last Hearing.  Your

15  updated counselor's report and psychological

16  report will also be considered.  Any change in

17  parole plans should be brought to our attention.

18  We'll reach a decision today and inform you

19  whether or not we find you suitable for parole

20  and the reasons for our decision.  If found

21  suitable for parole, the length of your

22  confinement will be explained to you.

23  This Hearing is going to be conducted in two

24  phases.  I'll discuss briefly the crime you were

25  committed for, your prior criminal and social

26  history, your parole plans, any letters of

27  support or opposition.  Commissioner Blonien

4

1   will discuss with you your progress since your

2   commitment, your counselor's report and your

3   psychological report.  Once that's concluded,

4   the Commissioners and your attorney will be

5   given an opportunity to ask you questions.

6   Before we recess for deliberations, your

7   attorney and you will be given an opportunity to

8   make a final statement regarding your parole

9   suitability.  Your statement should be directed

10  to why you feel you're suitable for parole.

11  We'll then recess, clear the room and

12  deliberate.  Once we've completed our

13  deliberations, we'll resume the hearing and

14  announce our decision.  The California Code of

15  Regulations states regardless of time served, a

16  life inmate shall be found unsuitable for and

17  denied parole if in the judgment of the Panel,

18  the inmate would pose an unreasonable risk of

19  danger to society if released from prison.

20  Mr. Luther, you have certain rights.  Those

21  rights include a timely notice of this Hearing,

22  the right to review your Central File, and the

23  right to present relevant documents.  Have these

24  rights been met?

25         **ATTORNEY RUTLEDGE:**  Yes.

26         **PRESIDING COMMISSIONER GARNER:**  Thank

27  you.  You also have the right to be heard by an

5

```
 1   impartial Panel.   Today myself and Commissioner
 2   Blonien will be your Panel.   Any objections to
 3   the Panel?
 4           ATTORNEY RUTLEDGE:   None.
 5           PRESIDING COMMISSIONER GARNER:   Thank
 6   you.   You'll receive a copy of our written
 7   tentative decision today.   That decision is
 8   subject to review by the Decision Review Unit.
 9   It is also subject to review by the Governor.
10   It will become effective within 120 days and a
11   copy of the tentative decision and a copy of the
12   transcript will be sent to you.
13   Mr. Luther, you know, in May of 2204, they
14   changed the appeal process.   Previously, you
15   could appeal Panel actions to the Board, now you
16   have to go to the courts (indiscernible).
17           INMATE LUTHER:   Uh, no.
18           PRESIDING COMMISSIONER GARNER:   Okay.
19   Information concerning that you can get from
20   your counselor or the prison law library
21   directly.   It's just essentially -- it was a
22   change in the appeal process.
23   You're not required to admit your offense or
24   discuss your offense if you do not wish to do
25   so.   However, this Panel does accept as true the
26   findings of the court and you're invited to
27   discuss the facts and circumstances of the
```

6

1  offense if your desire.  The Board will review

2  and consider any prior statement you've made

3  regarding the offense in determining your

4  suitability for parole.

5  And at this time, I'm going to ask Commissioner

6  Blonien if there's confidential material in your

7  file and if we'll be using it today?

8      **DEPUTY COMMISSIONER BLONIEN:**  There's

9  none that we'll be using today.

10      **PRESIDING COMMISSIONER GARNER:**  Okay,

11  thank you.  Ms. Rutledge, Hearing Checklist over

12  there somewhere?

13      **ATTORNEY RUTLEDGE:**  Yes, we have --

14      **PRESIDING COMMISSIONER GARNER:**  Other

15  than the documents that you (indiscernible).

16  Okay.  Any additional documents to be submitted

17  today?

18      **ATTORNEY RUTLEDGE:**  Mr. Luther has a few

19  things that we believe are on file with the

20  Board that weren't put in my file so we'll --

21  get to the letters, we may need to submit some

22  or do you want them now?

23      **DEPUTY COMMISSIONER BLONIEN:**  Any

24  chronos?

25      **INMATE LUTHER:**  I believe it was in there

26  last time.  It's the ideal -- my certification,

27  lead abatement certification.

7

1          **DEPUTY COMMISSIONER BLONIEN:**  Yeah.

2          **ATTORNEY RUTLEDGE:**  (indiscernible)

3          **INMATE LUTHER:**  Yeah, it's -- it's a lead

4     abatement.

5          **DEPUTY COMMISSIONER BLONIEN:**  Yeah, I

6     have that.

7          **INMATE LUTHER:**  Yeah, I --

8          **ATTORNEY RUTLEDGE:**  I don't think it's in

9     this (indiscernible)

10          **PRESIDING COMMISSIONER GARNER:** Okay.  If

11     you find that we don't have something, when we

12     get there, just let us know.  Any preliminary

13     objections.

14          **ATTORNEY RUTLEDGE:**  None.

15          **PRESIDING COMMISSIONER GARNER:**  Okay.

16     And will Mr. Luther be speaking with the Panel

17     today?

18          **ATTORNEY RUTLEDGE:**  He will (sic) be

19     discussing the commitment offense.  He's

20     discussed it in detail in a previous transcript

21     and other Hearings, but he will talk to the

22     Panel about other issues.

23          **PRESIDING COMMISSIONER GARNER:**  Okay.

24     Raise your right hand Mr. Luther?  Do you

25     solemnly swear the testimony you give at this

26     Hearing will be the truth, the whole truth and

27     nothing but the truth?

8

1          INMATE LUTHER:   I do.

2          PRESIDING COMMISSIONER GARNER:   Thank

3   you.  Okay.  So much as Mr. Luther has opted not

4   -- I'm going to go ahead and read the summary of

5   the crime, and I'll be reading from the August

6   2001 Board report since it's referenced back

7   from a more recent reports.

8   December 24, 1990 at approximately 5:25 p.m., a

9   California Highway Patrol Unit was dispatched to

10   East Haroling Avenue, and that's spelled H-A-R-

11   O-L-I-N-G, in Oildale, California, in reference

12   to a possible injury accident.  Upon arrival,

13   Officer Taggert, T-A-G-G-E-R-T, contacted

14   suspect Luther, who advised he had hit victim

15   Obert, O-B-E-R-T, with a gun, then placed the

16   gun outside on a shelf.  While speaking with

17   Luther, Officer Taggert observed that the

18   suspect was quite upset and crying.

19   Kern County Deputy Smallwood, S-M-A-L-L-W-O-O-D,

20   interviewed suspect Luther, who stated while

21   lying on his bed, victim Obert arrived at the

22   residence uninvited.  Luther grabbed the gun

23   that he had had for approximately nine years,

24   showed the victim the gun and told him to get

25   out.  Luther advised that the victim overcharged

26   him in a combative manner and to defend himself,

27   he struck Obert with the gun.  He indicated

1    Obert fell to the floor and he called 911 for

2    emergency.  He then threw the gun in the patio

3    area of the residence where Officer Taggert

4    later located it.  Suspect Luther was placed in

5    custody and transported to the Sheriff's

6    Department for questioning.  Luther was advised

7    of his rights, which he declined to waive.

8    However, he made the statement to the Deputy

9    that victim Obert, quote, bought my life with

10    drugs, end quote.

11    While in custody, he requested to go outside for

12    fresh air as he had drank a pint of peppermint

13    Schnapps just prior to the incident and needed

14    fresh air.  He was allowed to go outside in the

15    company of the Deputy, then returned into the

16    interview room where he fell asleep until the

17    arrival of investigative detectives.  He then

18    made unsolicited statements to the detectives

19    such as, quote, it was an accident.  All I did

20    was hit him with the gun.  I didn't shoot him.

21    I slapped him, end quote.  Quote, I didn't like

22    the guy.  He's been fuckin' with my girlfriend,

23    Tesha, T-E-S-H-A, Hill, end quote.  He was again

24    advised of his Miranda rights and that

25    (indiscernible) to answer questions.  He stated

26    that one of his children had alerted him that

27    Obert had come into the residence.  Upon seeing

10

1    Obert, he told him to, quote, get out of my

2    house, end quote.   He then told detectives that

3    he'd owed the victim $200 for drugs and that

4    Obert had possibly come to the residence to

5    collect the debt.   Luther was advised that he

6    was under arrest for murder and transported to

7    Kern County Jail.

8    Victim Obert was transported to Memorial

9    Hospital where he was determined to be dead.   A

10   baggie containing 14.51 grams of marijuana and a

11   baggie of 1.71 grams of a chunky substance were

12   taken from the victim's pants.   Also found in

13   the victim's wallet was $1,431.23 in currency

14   and two quote, pay and owe sheets, end quote.

15   Cause of death was from a gunshot wound to the

16   head that entered Obert's body in the back,

17   right side of the neck above the hair line.

18   Obert also sustained blunt force trauma to the

19   right side of his face, another in front of the

20   face and a third causing bruising to the left

21   eye.   Obert was found to have a high

22   concentration of methamphetamine in his blood at

23   the time of the death.

24   Since we don't have an indication of any

25   interest in discussing this, I'm going to go

26   ahead and read from the same report, the

27   prisoner's version that was given at that time.

11

1    Inmate Luther was interviewed on June 1, 2001,

2    regarding the incident.  Inmate Luther gave the

3    following account.  On 12/24/90, December 24,

4    1990, Luther left his residence for the purpose

5    to purchase, quote, some weed, end quote.  He

6    stopped at a liquor store and bought a pint of

7    peppermint Schnapps then drove to a friend's

8    house where he smoked a joint.  He returned to

9    his residence.

10   At approximately 5:00 p.m., the victim came into

11   Luther's residence and walked into the bedroom.

12   Luther stated, quote, I told him to get out,

13   then reached for my gun when he went into the

14   living room.  He then came back in, I took the

15   gun and pointed it up to the ceiling and told

16   him to get the fuck out of my house, end quote.

17   Luther claims to have struck the victim across

18   the face with an open hand while holding the gun

19   then grasped the gun, quote, that's when the gun

20   went off, end quote.  He stated he thought the

21   gun had knocked the victim unconscious, that he

22   wasn't aware Luther was shot until his friend,

23   Roussel, R-O-U-S-S-E-L, rolled the victim over.

24   He then called 911 and became panicked, emptied

25   the gun and tossed it into the patio area.

26   When asked why he felt he was in danger when the

27   victim came into his home, Luther explained that

12

1   they had had animosity between them stemming

2   from a breakup with a girlfriend, who had then

3   become involved with victim Obert while living

4   with Luther.   Additionally, Luther admitted to

5   have purchased methamphetamines from the victim

6   and was in debt $200 to Obert.   Luther told this

7   writer upon learning his girlfriend was involved

8   with the victim, he broke off the relationship.

9   A few days later she returned in an attempt to

10  reconcile with him.   He stated he told her to

11  leave.   She left slamming the door on the way

12  out.   He then stated he kicked her vehicle

13  because she angered him by slamming the door.

14  He also admitted to knocking her glasses to the

15  ground and then stepping on them, breaking them.

16  It is speculated she may have come to -- she may

17  have told the victim about this behavior causing

18  Obert to come uninvited to his home.   He also

19  disclosed he owed the victim money for drugs and

20  that after this incidence occurred, he told the

21  victim he was not going to pay him.   When asked

22  by the writing why he made the decision, he

23  responded, he'd lost trust in Obert.   He stated

24  that he told the dealer he would pay him but not

25  the victim, quote, because there was no trust

26  thing.   He was going behind my back, end quote.

27  Luther stated that his defense attorney didn't

13

1  want him to disclose any of it though because of
2  the defense strategy.  He further stated that he
3  regretted his decision to listen to her, that he
4  disclosed more in this interview then he did at
5  trial.  Inmate Luther expressed regret and
6  remorse for his actions.  He stated, quote, I
7  never meant to hurt or kill nobody.  I would
8  never -- I would never own a gun again even if I
9  could, end quote.  Quote, the mistake I made was
10  picking up the gun.  I could have resolved it in
11  a different fashion where we would not have had
12  this outcome.  His family, his children have all
13  been hurt just as my family and kids have been
14  hurt, end quote.  He expressed that he was,
15  quote, flabbergasted that I was convicted, end
16  quote, because the victim, quote, was the
17  aggressor, end quote.
18  And so far as your prior criminal record, looks
19  like it was alcohol related, drunk driving in
20  '78 and you got acquitted.
21          **INMATE LUTHER:**  Yeah, I was 18 years old.
22          **PRESIDING COMMISSIONER GARNER:**  Okay.  In
23  January of '89, you were arrested and convicted
24  of driving under the influence of alcohol.
25  April of '89, arrested and convicted of drunk
26  driving again, and you were sentenced to three
27  years court probation, 30 days in jail, and 18

14

1   months suspended license.  And then in June of

2   '89, arrested for Vehicle Code violations, and

3   in December of '90, the arrest for this

4   particular crime.  And for the record, no

5   juvenile record, is that correct?

6           **INMATE LUTHER:**  Yeah.

7           **PRESIDING COMMISSIONER GARNER:**  Okay,

8   thank you.  So far as your personal factors, you

9   were born to parents George and Edith Luther of

10  Bakersfield?

11          **INMATE LUTHER:**  Yes.

12          **PRESIDING COMMISSIONER GARNER:**  Okay.

13  You're the third child and you have a brother

14  and a sister.

15          **INMATE LUTHER:**  Yes.

16          **PRESIDING COMMISSIONER GARNER:**  Who's the

17  oldest?

18          **INMATE LUTHER:**  My sister.

19          **PRESIDING COMMISSIONER GARNER:**  Your

20  sister.

21          **INMATE LUTHER:**  She's now a teacher

22  (indiscernible)

23          **PRESIDING COMMISSIONER GARNER:**  Okay, and

24  what's your brother doing?

25          **INMATE LUTHER:**  He's on his second

26  career.  He was a plumber pipe fitter and he

27  retired from the Union, and took a journeyman

15

1    card in electrician.  So, he's still working as

2    an electrician and (indiscernible)

3              **PRESIDING COMMISSIONER GARNER:**  And you

4    say your sister's a teacher?

5              **INMATE LUTHER:**  Yeah, my sister she --

6    she's in her old job.  She had to go in and have

7    surgery for carpal tunnel, and in doing that,

8    she already had two years of college, so she --

9    they retrained -- the State retrained her for a

10   new job.  So, she went back to school and became

11   a teacher (indiscernible)

12             **PRESIDING COMMISSIONER GARNER:**  They

13   still in the Bakersfield area?

14             **INMATE LUTHER:**  Yes.

15             **PRESIDING COMMISSIONER GARNER:**  Okay.

16   How about your folks?  They still there?

17             **INMATE LUTHER:**  Yeah, they -- my mom and

18   dad live in the house that I was building when

19   this happened, and my sister lives in the house

20   that I was living in at the time.

21             **PRESIDING COMMISSIONER GARNER:**  Okay.

22   And you completed high school in 1977,

23   graduating from North High School?

24             **INMATE LUTHER:**  Yes.

25             **PRESIDING COMMISSIONER GARNER:**  And began

26   to use drugs at 17.  Used cocaine on an

27   occasional basis and crank for about three to

16

1    six months, and admitted to the use of marijuana

2    for years on an average of three times a week?

3              INMATE LUTHER:  Yes.

4              PRESIDING COMMISSIONER GARNER:  What

5    first got you into the drugs at 17?

6              INMATE LUTHER:  The other kids around

7    said that you -- would never again.

8              PRESIDING COMMISSIONER GARNER:  You were

9    with others when you used drugs?

10             INMATE LUTHER:  Yes.

11             PRESIDING COMMISSIONER GARNER:  Did you

12   ever use them when you were by yourself?

13             INMATE LUTHER:  Yeah.

14             PRESIDING COMMISSIONER GARNER:  Alcohol

15   come into play at this time?

16             INMATE LUTHER:  Young age?

17             PRESIDING COMMISSIONER GARNER:  About

18   when did you start drinking?

19             INMATE LUTHER:  Yeah, just young, like --

20             PRESIDING COMMISSIONER GARNER:  How did

21   you pay for your drugs and alcohol?

22             INMATE LUTHER:  I worked.  I've always

23   worked since I was young.  My dad did instill

24   that in me.  At 12 years old, me and my brother

25   roofed my dad's house.  So, I knew how to roof a

26   house at 12 years old.

27             PRESIDING COMMISSIONER GARNER:  Okay.

17

1    You married Elaine Webb.

2         INMATE LUTHER:  I married Elaine Brewton.

3    The same day this happened, the tragic accident

4    happened, she got remarried to Mike Webb.

5         PRESIDING COMMISSIONER GARNER:  Okay.

6    So, at the time you married --

7         INMATE LUTHER:  Brewton, B-R-E-W-T-O-N.

8         PRESIDING COMMISSIONER GARNER:  Okay.

9    And divorced eight years later.  Three children.

10        INMATE LUTHER:  Three children, and I had

11   custody at the time.

12        PRESIDING COMMISSIONER GARNER:  At the

13   time of the offense.  And how old are the

14   children now?

15        INMATE LUTHER:  My oldest is 26, that's

16   my daughter, the oldest, Crystal.  Russell, my

17   son, is 25, and Cody, my youngest, is 23.

18        PRESIDING COMMISSIONER GARNER:  They all

19   doing okay?

20        INMATE LUTHER:  My oldest, she's doing

21   real good, and my son, he's a plumber pipe

22   fitter now.  He just graduated from college and

23   began journeyman.  And my youngest is sort of

24   struggling.  I got a granddaughter by her also,

25   and a grandson by my oldest, and a granddaughter

26   by my youngest.

27        PRESIDING COMMISSIONER GARNER:  What's

18

1  your youngest struggle?

2      INMATE LUTHER:  Money and my ex-wife,

3  Elaine (indiscernible).  She lives with my

4  youngest and her boyfriend, and they kind of

5  said they wanted me to come home before they got

6  married.  And I told them that probably -- I'd

7  just as soon see them get married right away,

8  but they're just -- they're struggling and money

9  situations.  So, my ex lives -- they all live

10 together -- pay the bills.

11     PRESIDING COMMISSIONER GARNER:

12 Employment history consisted of sporadic general

13 labor work for Lyle Schwebel, S-C-H-W-E-B-E-L.

14 It's a plastering company between '87 and '89.

15     INMATE LUTHER:  That was after I had got

16 custody of my kids for the fact that I was a

17 teamster and kind of hard to do jobs driving

18 when the driving consists of so many hours --

19 with the kids so --

20     PRESIDING COMMISSIONER GARNER:  Okay.

21 And you also worked for Elam, E-L-A-M, Tractor

22 Rental as a truck driver for approximately six

23 months in '88.

24     INMATE LUTHER:  Yeah, that was hauling

25 gold ore.

26     PRESIDING COMMISSIONER GARNER:  Okay.

27 And you received AFDC benefits until after

19

1   September of '90.

2          INMATE LUTHER:    That was after I had my

3   knee operated on.

4          PRESIDING COMMISSIONER GARNER:    You

5   earned a salary remodeling your father's home in

6   '90 and '91.

7          INMATE LUTHER:    That was when I was

8   building the house, connected to the house that

9   I was living in.

10         PRESIDING COMMISSIONER GARNER:    Okay.

11  So, you did an addition.

12         INMATE LUTHER:    It was -- the house, it

13  was on a property burned down and there was a

14  studio apartment in the garage, and my dad

15  bought the place and I remodeled the studio

16  apartment garage and lived in it, and then I

17  added on the complete house connected to it,

18  two-story house.

19         PRESIDING COMMISSIONER GARNER:    Okay.

20         INMATE LUTHER:    With a two-car garage.

21         PRESIDING COMMISSIONER GARNER:    Okay.

22  And indicated your parents are good people and

23  they've been supportive of you.

24         INMATE LUTHER:    Yes.

25         PRESIDING COMMISSIONER GARNER:    When you

26  were growing up, was there any alcohol use in

27  the home, your parents?

20

1       **INMATE LUTHER:**  My dad's always been a

2  beer drinker but just never got out of control

3  though.

4       **PRESIDING COMMISSIONER GARNER:**  Okay.

5  Any abuse in the house?

6       **INMATE LUTHER:**  No.  I think the last

7  time my dad ever laid a hand on me was when I

8  was eight years old.

9       **PRESIDING COMMISSIONER GARNER:**  Do you

10 have any childhood illnesses?  Hospitalizations?

11      **INMATE LUTHER:**  No.  I had bob wire -- I

12 was prone to bob wire, go to the hospital to get

13 stitched up.  I rode horses and motorcycles and

14 had nothing of any significance.

15      **PRESIDING COMMISSIONER GARNER:**  And what

16 were you doing at the time of this offense work

17 wise?

18      **INMATE LUTHER:**  I was just basically

19 working for my dad building on the house.

20      **PRESIDING COMMISSIONER GARNER:**  Uh huh.

21 Okay, this -- do you get visits from your

22 family?

23      **INMATE LUTHER:**  You know, so far and the

24 money is -- I do but they're not real regular.

25      **PRESIDING COMMISSIONER GARNER:**  Okay.

26 Who do you stay in contact with the most?

27      **INMATE LUTHER:**  My mother.

1      **PRESIDING COMMISSIONER GARNER:** Mother.

2      **INMATE LUTHER:** My dad's wants me to

3 always, you know -- otherwise, if I don't call

4 mom, she gets to feeling bad.

5      **PRESIDING COMMISSIONER GARNER:** Okay. So

6 far as your parole plans, you'd be employed back

7 -- is it Lyle Schwebel Plastering?

8      **INMATE LUTHER:** Yes. And of the off

9 time, building another home.

10      **PRESIDING COMMISSIONER GARNER:** Okay. So

11 far as community resources, you intend to attend

12 church regularly. Although he attends AA

13 meetings, doubts that he would attend upon

14 release, because he believes he gains far more

15 from his belief in God, therefore, his plan is

16 to enhance his church involvement upon release.

17 And I don't have any letters in support of

18 employment or anything.

19      **INMATE LUTHER:** All the old ones.

20      **ATTORNEY RUTLEDGE:** In the C File, there

21 were numerous letters of support as far as his

22 last Hearing, offers of employment -- from your

23 parents. I have a list here. I noted his Aunt

24 May -- Aunt Mary, Debbie Luther.

25      **INMATE LUTHER:** My Aunt Mary --

26      **ATTORNEY RUTLEDGE:** Oh, all three of his

27 children wrote letters. They wrote very

22

1    poignant letters about how they've kept in

2    contact with their father and how much they'd

3    like to see him again, and they know it was

4    wrong, basically the same thing.

5        PRESIDING COMMISSIONER GARNER:  Okay.

6    What I'll do is during deliberations, I'll go

7    through the file and get those and note them.

8        ATTORNEY RUTLEDGE:  And that's why --

9    okay, and his ex-wife, Elaine Brewton submitted

10   a letter as well.

11       PRESIDING COMMISSIONER GARNER:  Okay.

12   Well, we'll get all those in --

13       INMATE LUTHER:  My employer --

14       ATTORNEY RUTLEDGE:  The employer--

15       INMATE LUTHER:  -- friends of the family,

16   Ralph (indiscernible)

17       ATTORNEY RUTLEDGE:  He's a plasterer.

18       INMATE LUTHER:  Yes, it's his company.

19   His son's running the company now.

20       ATTORNEY RUTLEDGE:  Okay.

21       INMATE LUTHER:  That's who I would work

22   for.

23       PRESIDING COMMISSIONER GARNER:  Okay.

24   I'll cover those.  Okay, we did send out the

25   3042 Notices.  Those go to all the agencies that

26   had some direct involvement in your

27   apprehension, prosecution, the trial, the

23

1   defense, and for the record, we have received no

2   responses from any of them.

3   And now if I could get you to devote your

4   attention to Commissioner Blonien, who's going

5   to discuss your post-conviction factors.

6           **DEPUTY COMMISSIONER BLONIEN:**  So, Mr.

7   Luther, this is your first Subsequent Hearing.

8   Your last appearance before the Board was

9   4/29/02 and the decision was for a three-year

10  denial.  And the Panel recommended that you

11  attend self-help and therapy if available,

12  remain disciplinary free and complete a

13  vocational trade if possible.  You did come

14  before the Board in September, but it was

15  postponed for a new psych report, which we have

16  received, a report from Dr. Macomber dated

17  12/24/05.  I've also reviewed your counselor's

18  report by Counselor Derdesoto, D-E-R-D-E-S-O-T-

19  O, dated 12/14/05.

20  Your current custody level is Medium A and your

21  classification score is 19, which lowest

22  possible for CDC inmates.  Did you review these?

23          **INMATE LUTHER:**  Yes.

24          **DEPUTY COMMISSIONER BLONIEN:**  You got a

25  copy of the psych report.

26          **INMATE LUTHER:**  Yes, I did.

27          **DEPUTY COMMISSIONER BLONIEN:**  You got it

24

1    before we did.  And you got a copy of your

2    counselor's report.

3         INMATE LUTHER:  Yes, and the original

4    counselor's report is marked as (indiscernible)

5         DEPUTY COMMISSIONER BLONIEN:  Updated

6    one.

7         INMATE LUTHER:  Addendum is Derdesoto.

8         DEPUTY COMMISSIONER BLONIEN:  And did you

9    go through your C File?

10        INMATE LUTHER:  No.  I -- really nothing

11   new that I knew of.

12        DEPUTY COMMISSIONER BLONIEN:  Well, it's

13   always a good idea.  They get bigger and you get

14   all these little pieces of paper, and

15   (indiscernible) you want to, here's the one

16   that'll be gone.  So, it always good to keep

17   track of your C File, to copy the important

18   things yourself.  It's a was to do business.

19   In looking over your disciplinary record, you

20   have not had one 115 in your entire prison stay.

21   You've had two 128s, one in 1996 and one in

22   2000.  Did everybody in IDL get that one?

23        INMATE LUTHER:  Everybody.  I'm a tool

24   man.  I'm always down on the floor with the

25   tools.

26        DEPUTY COMMISSIONER BLONIEN:  And it had

27   to do with altering doors.

25

1        **INMATE LUTHER:**  I'm always putting screws

2    in a door so people can hang their shower bags

3    on the inside of the door.  And they wrote us

4    all an information chrono and had to go back and

5    taken them all out and weld them up.

6        **DEPUTY COMMISSIONER BLONIEN:**  Yeah, I

7    figured that.

8        **INMATE LUTHER:**  Repaint.

9        **DEPUTY COMMISSIONER BLONIEN:**  That's what

10   it looked like.  You are a worker, you know,

11   since you've been in here, you've been a worker,

12   and I was interested that you said when you were

13   on AFDC, it was because you were disabled for a

14   while.

15       **INMATE LUTHER:**  Cause of my knee.

16       **DEPUTY COMMISSIONER BLONIEN:**  Yeah.

17   Cause in here it just shows that you know how to

18   work.  You were a PIA machine operator.  You

19   were in Textiles.  You've been a part of IDL

20   until the program ended for lack of funding.

21       **INMATE LUTHER:**  I just went back to work.

22   Out here they only got work for a little while

23   so I --

24       **DEPUTY COMMISSIONER BLONIEN:**  I know, the

25   Governor's got a new budget out there.  The --

26   you're an educational clerk now?

27       **INMATE LUTHER:**  No, I'm just a porter.

26

1    **DEPUTY COMMISSIONER BLONIEN:**  You're a

2    porter.

3    **INMATE LUTHER:**  (indiscernible)

4    **DEPUTY COMMISSIONER BLONIEN:**  So what are

5    you doing Wednesday nights?

6    **INMATE LUTHER:**  Just not really nothing

7    on Wednesday nights.

8    **DEPUTY COMMISSIONER BLONIEN:**  Cause I was

9    wondering, it shows that AA was on Wednesday

10   nights for a long time.  And you're not going to

11   AA any more?

12   **INMATE LUTHER:**  No, I just basically read

13   the Bible.  And my faith is in Jesus Christ.

14   He's the one that took these infirmities away

15   from me.  And me, my feelings, going back to man

16   to ask for help -- the Good Lord has already

17   taken from me, is -- I work my faith in that and

18   the Good Lord and he already took that away from

19   me.

20   **DEPUTY COMMISSIONER BLONIEN:**  I see

21   nothing --

22   **INMATE LUTHER:**  I feel it's better to

23   read the Bible, which I believe is the best

24   self-help book in the world.

25   **DEPUTY COMMISSIONER BLONIEN:**  I see

26   nothing wrong with that except one thing.  Your

27   alcohol and drug problem, what was it a pint of

27

1   peppermint Schnapps, that much?

2        INMATE LUTHER:  I didn't drink the whole

3   pint.  I drank --

4        DEPUTY COMMISSIONER BLONIEN:  Thank God.

5        INMATE LUTHER:  No, I had a few drinks

6   with the people where I went (indiscernible --

7   voice over)

8        DEPUTY COMMISSIONER BLONIEN:  By anyway,

9   the point is that it was a part of your

10  commitment offense.

11       INMATE LUTHER:  Yeah.

12       DEPUTY COMMISSIONER BLONIEN:  And getting

13  rid of a major problem like that takes a lot of

14  support.  And having support through your church

15  is excellent, but the --

16       INMATE LUTHER:  Quit smoking, I don't

17  cuss, cussing's hard --

18       DEPUTY COMMISSIONER BLONIEN:  You're not

19  going to fly away on me here are you?

20       INMATE LUTHER:  No, but cussing's --

21  that's cussing, try to -- that takes a period of

22  time.  That don't just stop all at once.  I

23  don't cuss and that is -- that's probably one of

24  the hardest things, you know, cause I quit

25  smoking cold turkey, and that's supposed to be

26  harder than heroine they say.

27       DEPUTY COMMISSIONER BLONIEN:  Really?

28

1   Anyway, you've misdirected my statement, but I
2   am glad you quit smoking.  You look healthy.
3   Saying that you're done with it and saying that
4   you're dealing with this major problem that you
5   had in your life through your religion is
6   commendable.  But you're released into the
7   community, there are many stressors in the
8   institution, and we all know that, but there are
9   many stressors in the community, and knowing
10  that you have a significant number of tools and
11  places to help you, because it's easy to slip, I
12  mean, once you get out.  So, when we look at AA,
13  we look at it as one tool.  When we look at you
14  -- commitment to church and the value of the
15  Bible, that's another tool.  And you were in AA
16  since 1999 to '02, and it is a religious-based
17  help.  So, that's my point there.
18  You do anything else in the arena of self-help
19  in the institution?
20          INMATE LUTHER:  No, just --
21          DEPUTY COMMISSIONER BLONIEN:  Read the
22  Bible.
23          INMATE LUTHER:  I try to work out and
24  stay healthy so upon release, I'm still able to
25  go to work and I read the Bible every day.  And
26  I have a -- I live with a Christian brother and
27  actually I have lived with him almost ten years,

1   the same cell, same person.

2       **DEPUTY COMMISSIONER BLONIEN:**  My advise

3   is, there's always more you can do.  And we

4   understand that services and programs aren't

5   always available, but documenting what you do on

6   your own is good.

7       **INMATE LUTHER:**  I just -- one thing is I

8   know for a fact in my heard, I'll never do drugs

9   or alcohol again for the fact that it's -- I

10  doubt if you jumped out of an airplane and the

11  parachute didn't open, would you go and do it

12  again?  The same difference.  It took 15 years

13  from my life.  I hurt all kinds of people and

14  there's no way that I'd ever go back to do it

15  again.

16      **DEPUTY COMMISSIONER BLONIEN:**  You also

17  did Breaking Barriers.  That was a while ago,

18  huh?

19      **INMATE LUTHER:**  Oh, that was the -- I

20  can't remember the name of it.  It was the group

21  down in -- they headed -- in the other chapel

22  (indiscernible) Chapel.  It was, I can't

23  remember the name of it.  I got a certificate

24  for it.

25      **DEPUTY COMMISSIONER BLONIEN:**  Yeah,

26  Breaking Barriers.

27      **INMATE LUTHER:**  Yeah.

30

1      **DEPUTY COMMISSIONER BLONIEN:** Do you

2  participate in Protestant Chapel? Or what

3  chapel do you participate in?

4      **INMATE LUTHER:** Mostly -- I have one down

5  there, but most of the time, it's just for the

6  people I know on the yard. Anybody that I could

7  help out.

8      **DEPUTY COMMISSIONER BLONIEN:** And --

9  well, do you have a specific church you're going

10  to go to?

11      **INMATE LUTHER:** Not really. I'd just --

12  I'd have to go find out who is more in line with

13  -- I like the way that Dr. David Jeremiah and

14  Charles Stanley, the way they see -- and it's

15  more like a Bible study, teaching you rather

16  than getting (indiscernible) just preaching at

17  you.

18      **DEPUTY COMMISSIONER BLONIEN:** But you

19  haven't researched that yet?

20      **INMATE LUTHER:** No. Friends of my mom,

21  they actually come to see me in county jail,

22  that she used to work with, and I was going to

23  go first, go see what their church was like.

24      **DEPUTY COMMISSIONER BLONIEN:** In terms of

25  the work you do, you have gained skills, and

26  there is the letter from Kate Clayton, who notes

27  that you have a lead worker's certificate --

31

1          INMATE LUTHER:  Led.

2          DEPUTY COMMISSIONER BLONIEN:  -- led

3    worker's certificate with Department of Health

4    Services.  (indiscernible) certificate is good

5    for one year, and you must complete

6    (indiscernible) approved continuing education to

7    renew it.

8          INMATE LUTHER:  I think they renewed it

9    one time other than the original.

10         DEPUTY COMMISSIONER BLONIEN:  Uh huh.

11         INMATE LUTHER:  But -- you want to look

12   at it.

13         DEPUTY COMMISSIONER BLONIEN:  No, I think

14   I've got it here.

15         INMATE LUTHER:  I think they renewed it

16   one time during the period we was doing the

17   doors.

18         DEPUTY COMMISSIONER BLONIEN:  And you

19   have positive chronos, laudatory chronos about

20   your position in inmate day labor, Correctional

21   Officer Salas, S-A-L-A-S, noted that you've been

22   involved in various projects and that you're

23   immediately responsive to any request.  That you

24   virtually are always in good humor and you're

25   constantly ready to volunteer at a moment's

26   notice, and that you extend your eagerness to

27   help equally to inmates and staff alike.  You

32

```
1   communicate well with both staff and inmates,

2   and that you're respected by all, and he is

3   confident that you could make a good transition

4   into society.  And he wrote you two memos of

5   support.  And then there were the memos from AA

6   from '99 to '02.

7   What are you reading right now?  Besides the

8   Bible?

9           INMATE LUTHER:  I just finished a

10  (indiscernible) novel.

11          DEPUTY COMMISSIONER BLONIEN:  What?

12          INMATE LUTHER:  Anna Lee Waldo's Prairie.

13  It was on Charles (indiscernible - name).  It

14  was a -- one of the first people to start what

15  we now know as the rodeos.

16          DEPUTY COMMISSIONER BLONIEN:  Oh, that

17  would have been interesting.

18          INMATE LUTHER:  (indiscernible)

19          DEPUTY COMMISSIONER BLONIEN:  In terms of

20  your psych report, the doctor noted that you

21  have a very strong work ethic and spent some

22  time outlining your work history.  And that --

23  it says, you're not actively involved in drug

24  abuse at the time of the commitment offense, is

25  that true?

26          INMATE LUTHER:  At the time of the

27  offense, well, I smoked a joint.
```

33

1     **DEPUTY COMMISSIONER BLONIEN:**  Well, yeah,

2  I think that counts.

3     **INMATE LUTHER:**  Smoked a joint and I

4  didn't drink a whole bottle of peppermint

5  Schnapps but I shared it with the other people

6  that was there.

7     **DEPUTY COMMISSIONER BLONIEN:**  That would

8  be tough wouldn't it.  That you've been active

9  in Alcoholics Anonymous for several years, but

10  you're currently not because you're attending

11  and studying the Principles of the Overcomers

12  Program.  We didn't talk about that.

13     **INMATE LUTHER:**  I forgot to mention that.

14  I do read that.  It's a newsletter.  It's

15  Overcomers magazine, or not magazine but

16  newsletter.

17     **DEPUTY COMMISSIONER BLONIEN:**  Overcoming

18  what?

19     **INMATE LUTHER:**  It's a Christian based

20  AA.  The same guidelines as basically as AA but

21  it's all scripture.  I like scripture.

22     **DEPUTY COMMISSIONER BLONIEN:**  When you

23  were in AA, did you work through the steps?

24     **INMATE LUTHER:**  I basically had trouble

25  just -- I have trouble just memorizing things.

26  I couldn't --

27     **DEPUTY COMMISSIONER BLONIEN:**  Well, a lot

34

1  of people do.

2      INMATE LUTHER:  I couldn't tell you a

3  whole song, sing a whole song.  I do -- I can

4  recite the 29 books of the New Testament from

5  front to back.  But --

6      DEPUTY COMMISSIONER BLONIEN:  I'm not

7  going to test you.  I couldn't so.

8      INMATE LUTHER:  Matthew, Bartlet, John --

9      DEPUTY COMMISSIONER BLONIEN:  He notes

10  that you've been disciplinary free and that

11  that's evidence of your full commitment and your

12  self-control.  That there's no evidence of

13  alcohol abuse during the current diagnostic.

14  So, under Access I, he says that there's no

15  contributory clinical disorder, usually they

16  would say alcohol or drug dependency in

17  remission, institutional remission.  That he

18  finds no mental health issues with you, so

19  there's no personality disorder under Access II.

20  And he found no physical disorders under Access

21  III.  That's good.  He gave you a Global

22  Assessment Functioning score of 90, which is the

23  highest possible inmate and individual in a

24  community.  That, he notes that you accept full

25  responsibility for your actions, that if you'd

26  not been involved in negative behavior, this

27  offense would never have occurred.  That in

1  considering your potential for dangerous

2  behavior in the institution, inmate Luther

3  remains entirely disciplinary free.  And that

4  you've changed a great deal in the last 15

5  years.  You've grown in self-awareness, maturity

6  and positive direction in his life and self-

7  control.  As a result, your potential for

8  dangerous behavior is definitely below average

9  in comparison to other inmates.  And in

10  considering your potential for dangerous

11  behavior if released to the community, he

12  administers the level of service inventory

13  revised testing, and that your score placed you

14  at the 3.4 cumulative percentile in comparison

15  to other prison inmates, which means that you

16  would do 96 percent better than any other inmate

17  if paroled.  And this would indicate that your

18  potential for dangerous behavior in the

19  community is no greater than that of the average

20  citizen.  In fact, based upon his life changes,

21  it is below average in comparison to the average

22  citizen.  Do you agree with that?

23       **INMATE LUTHER:**  Yes.  Average citizen

24  don't know the trial that I've went through.

25  They'd be more prone to pick up a gun, where no

26  matter what the situation, there's no way I

27  will.

36

1       **DEPUTY COMMISSIONER BLONIEN:**  Well, with

2  that, I'm going to turn it back to the Chair.

3       **PRESIDING COMMISSIONER GARNER:**  Okay.  I

4  don't have any other questions.  Do you have any

5  follow-up?

6       **DEPUTY COMMISSIONER BLONIEN:**  No.

7       **PRESIDING COMMISSIONER GARNER:**  Okay, Ms.

8  Rutledge, any question?

9       **ATTORNEY RUTLEDGE:**  Yes.  Mr. Luther, you

10  indicated that the Bible is your self-help.

11  Would you say the Ten Commandments are your

12  Steps for living?

13       **INMATE LUTHER:**  The New Testament covers

14  the Ten Commandments by two steps, thou shalt

15  love thy God with all thy heart, all thy mind

16  and all thy soul, and love thyself as thy -- and

17  then second is to love thyself as thy neighbor.

18  Or love thy neighbor as thyself I should say.

19  That's the two that covers the whole New -- Old

20  Testament.

21       **ATTORNEY RUTLEDGE:**  Like the Ten

22  Commandments.

23       **INMATE LUTHER:**  The Ten Commandments.

24       **ATTORNEY RUTLEDGE:**  All right.  And I

25  wanted to note too, are you aware -- isn't it

26  true that Dr. Bob and Bill W., the founders of

27  AA were Christians, that they based the 12 Steps

37

1   on the Bible?

2         INMATE LUTHER:  Yes.

3         ATTORNEY RUTLEDGE:  Okay.  And do you

4   attend chapel?  Oh, maybe we talked about that.

5   Is there a group of Christian men that you spend

6   your time with improving?

7         INMATE LUTHER:  Yeah.

8         ATTORNEY RUTLEDGE:  Do you avoid being

9   around people that -- you stay away from the --

10        INMATE LUTHER:  People that do drugs?

11        ATTORNEY RUTLEDGE:  That element?

12        INMATE LUTHER:  Yeah.

13        ATTORNEY RUTLEDGE:  All right.  And tell

14  us about your work record in prison.  How many

15  -- I think you mentioned that you had gone life

16  only missing one day, is that true?

17        INMATE LUTHER:  That's true.

18        ATTORNEY RUTLEDGE:  And you remain in

19  contact with your children?

20        INMATE LUTHER:  Yes.

21        ATTORNEY RUTLEDGE:  I just wanted to ask

22  you, if you were released from prison four

23  months from today, what -- tell us about what

24  you'd do the first three days upon your release?

25        INMATE LUTHER:  Spend it with my family

26  and probably sleep outside.

27        ATTORNEY RUTLEDGE:  Sleep outside?

38

1     **INMATE LUTHER:**  I'd just -- I haven't

2  seen the stars in years so, I'd just like to

3  sleep outside probably the first night and just

4  spend it with my grandma, my family's my number

5  one priority.

6     **ATTORNEY RUTLEDGE:**  Have you been able to

7  meet your grandkids yet?

8     **INMATE LUTHER:**  Yes.  My oldest is --

9  well, it's my grandson, he's -- he just turned

10  eight, and my granddaughter, she'll be two next

11  month, well, this month, the end of this month.

12     **ATTORNEY RUTLEDGE:**  So, when you get out,

13  are you planning to replace the support group

14  you have here with -- on the outside with other

15  Christian men?  Or what's your plan for a

16  support group?

17     **INMATE LUTHER:**  I'd like to get involved

18  with the church and -- you see it every year of

19  what -- on TV that people go and serve

20  Thanksgiving, I'd like to do that.

21     **ATTORNEY RUTLEDGE:**  You want to get

22  involved like a prison ministry type of thing or

23  just help homeless people or what are you

24  thinking?

25     **INMATE LUTHER:**  Just anywhere I can, just

26  to make a difference in society.  Just to help

27  out.  Just be positive, something positive.

39

1      **ATTORNEY RUTLEDGE:**  You might want to

2   talk to other -- would you think you'd ever be

3   able to talk to youth in trouble or something

4   about your experiences?  Would you be willing to

5   do that?

6      **INMATE LUTHER:**  I would, yes.  But first

7   I will have to give me, you know, get everything

8   together and -- I'm not really equipped -- real

9   vocal person as far as trying to get what I'm

10  trying to convey across.  But in small settings,

11  I could see helping kids, keep kids from going

12  -- from doing drugs.  I hate drugs with a

13  passion.  And I see it every day in here.  It's

14  just --

15     **ATTORNEY RUTLEDGE:**  No further questions.

16     **PRESIDING COMMISSIONER GARNER:**  Okay,

17  would you like to close?

18     **ATTORNEY RUTLEDGE:**  Yes.  Beginning with

19  the offense, it's a very unfortunate incident

20  and Mr. Luther, after the reports I've read,

21  he's maintained the same statement that he first

22  gave police.  In fact, he called the police.  In

23  reading the transcript from the last Hearing, he

24  answered all questions by the Board directly,

25  explaining what took place.  He has identified

26  the factors that led to this behavior with the

27  psychologist.  Both the psychology report and

1    the Board report are glowing about his insight

2    into the offense.  It was wrong, even back to

3    the probation report done around the time of the

4    offense.  He had made the same comments to the

5    Probation Officer, that he shouldn't have had a

6    gun, shouldn't have been -- let's see if I can

7    quote -- that he just had the gun to show the

8    guy out of his house.  This person was on drugs

9    at the time, that he didn't mean to shoot him,

10   that when he hit him the gun went off.  And, you

11   know, his prior offenses have nothing to do with

12   weapons or that sort of a thing.  He indicated

13   that --

14            **DEPUTY COMMISSIONER BLONIEN:**  Let me turn

15   the tape.

16                      (Off the Record)

17            **DEPUTY COMMISSIONER BLONIEN:**  Well, my

18   technical expertise has got us on tape again.

19            **ATTORNEY RUTLEDGE:**  Excellent.  All

20   right.  Anyway, I was going over the comments

21   that Mr. Luther made at the time of the offense,

22   which seem consistent throughout his time in

23   custody, and notably, his counselor, a person

24   who deals with inmates as a career, said some

25   very good things.  Under Item 4, Future Plans

26   Assessment, that he foresaw no problems with Mr.

27   Luther's ability to succeed on parole.  He has

41

1   programmed exceptionally well, has excelled in

2   his work assignment.  And his prior record is

3   relatively minor in nature.  He has no juvenile

4   record.  He will have no gang, drug or pattern

5   of violence issues which will inhibit his

6   progress.  His parole plans appear solid.  He

7   has an array of marketability -- marketability

8   for employment.  It is my belief that Luther

9   harnesses a sincere level of remorse for his

10  life crime and will forever hold himself

11  accountable for the adverse effect it had on the

12  victim's family and his own.  His intention was

13  not to take a life that tragic way.  He accepts

14  responsibility and is focused on reunification

15  with his family and a successful parole.

16  And I really see that from the beginning of the

17  crime taking place, he fully cooperated.  He

18  gave a statement and he's maintained that exact

19  same statement.  He's taken responsibility for

20  his role in this tragedy.  And over the years

21  while he's been incarcerated, has come to terms

22  with his, again, the causes that led to that,

23  the alcohol and the drugs.  He had a pretty

24  strong social history as far as family

25  background.  His parents, his ex-wife and his

26  children all still support him.  I really would

27  like the Board to take a look at the letters

42

```
 1   from his children.  It looks to me like he has
 2   matured.  While he's been in here, he's
 3   continued to father them from inside the prison
 4   walls as best he can.  As far as disciplinaries
 5   go, minor writeups.  No 115s in fifteen years.
 6   He's got laudatory chronos for his work
 7   successes.  He's gotten ones and twos in a lot
 8   of his work writeups.  He did spend four years
 9   in AA.  He's actually had prison personnel give
10   him a vote of confidence for his adjustment on
11   parole.  And he stays active with self-help by
12   reading the Overcomers' newsletter.  He's -- and
13   he calls the Bible the best self-help book ever.
14   And is able to articulate to us how much that's
15   helping him, how much the Lord -- he's relied
16   upon his Lord to abstain from cigarettes,
17   alcohol and cussing.
18   He had numerous trades when he came, in the
19   construction field.  But he still tried to pick
20   up some extra skills here at the direction of
21   the Board with his Led Certification.  And I
22   would note too that I believe him when he says
23   that he's relying upon the Bible as a self-help
24   to abstain from these dangers.  Nothing in his
25   record to show he's had any problems with
26   substance abuse while incarcerated, and his
27   counselor doesn't see as an issue either or the
```

43

```
 1   psychologist.  GAF score is 90.  I think in
 2   talking to him, it's evident he's very mature,
 3   has a very positive attitude.  He's taken care
 4   of himself physically as he said, in
 5   anticipation of working upon his release.
 6   There's no reason for us not to believe that as
 7   soon as he gets out, he's going to have the full
 8   support of his family based upon their letters
 9   and his comments.  He's got jobs lined up for
10   him.  He has plans to seek out support in a
11   church setting and possibly use his experiences
12   to help others.  I would last, just note, on a
13   recent psych report, which is a glowing report,
14   he's an experienced journeymen carpenter and is
15   very knowledgeable about plumbing.  He has been
16   active in AA for several years.
17   He talks about his commitment to the creator and
18   a strong commitment to live a life dedicated to
19   others.  He also mentioned several times that
20   he's (indiscernible) victim's token of the
21   father.  His feelings of remorse and sorrow
22   about this offense, and his actions appear to be
23   very sincere and genuine.  He has also noted the
24   prison experience has been very beneficial to
25   him.  He knows now the seriousness of his
26   actions and how important it is to change his
27   negative lifestyle, becoming a better person to
```

44

1    the best of his ability.  I believe his comments
2    to the Board today and his demeanor support that
3    comment.
4    So, all these things considered, I think Mr.
5    Luther is an excellent candidate for re-entering
6    the community and I would ask the Board to
7    please give him a date for parole.
8            **PRESIDING COMMISSIONER GARNER:**  Thank
9    you.  Mr. Luther, this is your opportunity to
10    address the Board with respect to why you think
11    you're suitable.
12            **INMATE LUTHER:**  I've tried to do
13    everything that the Board asked me to do as well
14    -- I've tried to do everything that everybody is
15    -- that whole process has just asked me to do
16    from the start.  I've worked and stayed from
17    drugs and alcohol, and just tried to better my
18    life.  And upon release, I feel I could do a lot
19    more for other people out there than I can in
20    here as far as for the younger kids.  And
21    letting them know that just -- they might think
22    it's just, you know, a recreational drugs or
23    whatever.  It's a whole lot more than that.
24    Drugs, I cannot stand drugs, and there's no way
25    I would ever do drugs again in my life.  Bill
26    Gates don't have enough money to get me to do
27    drugs.  And I just feel I could do a whole lot

45

1   more out there than I can in here.

2   And as far as -- I wish there was something that

3   I could do for his family, but there's really

4   nothing I know I could do other than to be a

5   better person.  And on that that's all I know to

6   say.

7          **PRESIDING COMMISSIONER GARNER:**  Okay,

8   well, thank you.  The time is now 11:44 a.m.,

9   and we'll recess for deliberation.

10                    **R E C E S S**

11                     --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1     CALIFORNIA BOARD OF PAROLE HEARINGS

2            D E C I S I O N

3     **DEPUTY COMMISSIONER BLONIEN:**  Okay, we're

4     on record.

5     **PRESIDING COMMISSIONER GARNER:**  Okay.

6     The time is now 12:02 p.m., in the matter of

7     Gary Luther, E Edward 98605.  Mr. Luther, the

8     Panel's reviewed all the information received

9     from the public and relied on the following

10    circumstances in concluding you're not suitable

11    for parole and would pose an unreasonable risk

12    of danger to society or a threat to public

13    safety if released from prison.  And, sir, we

14    started with the commitment offense in that it

15    was carried out in an especially cruel manner.

16    The offense was carried out in a manner which

17    demonstrated an exceptionally callous disregard

18    for human suffering in that the victim was found

19    to have had sustained one gunshot wound to the

20    head and three blunt force trauma wounds to the

21    head.  Sir, the motive for this is basically --

22    it's the drug culture that -- you got yourself

23    caught up in something, you owed a drug dealer

24    money, you were concerned about that.  And

25    again, I think you've identified now the impact

26    that drugs have on your life and what you've

27    **GARY LUTHER E-98605    DECISION PAGE 1    1/10/06**

47

1    done about it, which is commendable.

2    These conclusions were drawn from the Statement

3    of Facts that were contained in the Board report

4    of 2001, in that on December 24, 1990 at

5    approximately 5:25, a California Highway Patrol

6    unit was dispatched to East Haroling Avenue in

7    Oildale, California, in reference to a possible

8    injury accident.

9    Upon arrival, Officer Taggert contacted suspect

10   Luther, who advised he'd hit victim Obert with a

11   gun then placed the gun outside on a shelf.

12   While speaking with Luther, Officer Taggert

13   observed that the suspect was upset and crying.

14   Kern County Deputy Smallwood interviewed the

15   suspect Luther, who stated that while lying on

16   his bed, victim Obert arrived at the residence

17   uninvited.  Luther grabbed a gun that he'd had

18   for approximately nine years, showed the victim

19   the gun then told him to get out.  Luther

20   advised that the victim charged him in a

21   combative manner and to defend himself, he

22   struck victim Obert with the gun.  He indicated

23   Obert fell to the floor and then he called 911

24   for emergency.  He then threw the gun in the

25   patio area of the residence where Officer

26   Taggert later located it.

27   **GARY LUTHER E-98605    DECISION PAGE 2    1/10/06**

1    Sir, the Panel noted and considered the fact

2    that your previous criminal record was minor in

3    nature.  Unfortunately, it also had some

4    elements of alcohol use involved in it.  And

5    that during this particular period of time, that

6    there was some instability in your social

7    history associated with drugs and alcohol.

8    With respect to institutional behavior, the

9    Panel's concluded that you've programmed in a

10   limited manner considering the amount of time

11   that you've been in.  We're also concerned that

12   you've failed to upgrade yourself educationally

13   where available and most importantly, we'll

14   speak to this in greater length later, but

15   you've not sufficiently participated in self-

16   help programs.

17   The Panel considered and noted that you've got

18   an exemplary record with respect to your

19   conduct.  In 2000, you had a minor 128,

20   essentially of no significance.  And more

21   importantly, that you've had no 115s during the

22   entire time that you've been incarcerated.

23   Psychiatric report dated December 2005 by Dr.

24   Macomber is a favorable report and it's

25   supportive.  Sir, with respect to your parole

26   plans, we did go through all of the letters and

27   **GARY LUTHER E-98605    DECISION PAGE 3    1/10/06**

49

1    just so you know for the record, we read the

2    letter from your Aunt Mary, Debbie Luther, Cody

3    Luther, Crystal Luther, Russ Luther, your ex-

4    wife, Edith Brewton, a neighbor George

5    Chamberlain, the employment offers from

6    Schwebel, a letter from your mom and dad, and a

7    letter from your sister Joy.  Sir, one of the

8    things that you need to do with these is all of

9    these letters were dated 2001, and while I have

10   no doubt that they're still valid, you need to

11   get them updated each time you come to Board.

12   This could be a matter that could get you

13   slammed at review because there's no way to

14   verify.  People's circumstances change, whether

15   a company is still in business, and again, the

16   person that's going to be reviewing this, isn't

17   going to have the benefit of sitting in front of

18   you and having you make these assertions as

19   opposed -- they're going to be strictly looking

20   at a record.  So, when you come back for your

21   next Board, have all of these things updated and

22   made current so that we know that they're still

23   intact and would be available to you.

24   We did note that in response to the 3042

25   Notices, that we received no replies from any of

26   the people that received the letters.  Sir, to

27   **GARY LUTHER E-98605    DECISION PAGE 4    1/10/06**

1    kind of follow up on the self-help, the Panel

2    concluded that you need some therapy in order to

3    face, discuss and understand and cope with

4    stress in a non-destructive manner, and until

5    some progress is made, that you continue to be

6    unpredictable and a threat to others.

7    Nevertheless, we've got a number of things we

8    want to commend you for.  Your getting the Led

9    Certificate, again reaffirming the being

10   disciplinary free, positive work records, you're

11   just a good worker.  And it shows, the chronos

12   that you received there.  However, these factors

13   -- however, these positive aspects of your

14   behavior do not outweigh the factors of

15   unsuitability.

16   And in a separate decision, the Panel finds that

17   it's not reasonable to expect that a parole

18   would be granted during the next two years and

19   the specific reasons for those follows:  that

20   the offense was carried out in an especially

21   cruel manner, in that on December 24, 1990 at

22   approximately 5:25 p.m., a California Highway

23   Patrol unit was dispatched to East Haroling

24   Avenue in Oildale, California, in reference to a

25   possible injury accident.  Upon arrival Officer

26   Taggert contact suspect Luther, who advised that

27   **GARY LUTHER E-98605    DECISION PAGE 5    1/10/06**

51

1    he had hit victim Obert with a gun, then he

2    placed the gun on an outside shelf.  While

3    speaking with Luther, Officer Taggert observed

4    the suspect was quite upset and crying.  Kern

5    County Deputy Smallwood interviewed suspect

6    Luther, who stated that lying on his bed, victim

7    Obert arrived at the resident uninvited.  Luther

8    grabbed the gun that he'd had for approximately

9    nine year, showed the victim the gun, then told

10   him to get out.  Luther advised victim Obert

11   charged him in a combative manner and in

12   defending himself, he struck victim Obert with

13   the gun.  He indicated Obert fell to the floor

14   and then he called 911 for emergency.  He then

15   threw the gun in the patio area of the residence

16   where Officer Taggert later located it.

17   Again, sir, the offense was carried out in a

18   dispassionate manner, and that the offense was

19   carried out in a manner that demonstrates an

20   especially callous disregard for human

21   suffering, and again, we noted that the victim

22   sustained a gunshot wound to the back of the

23   head and that there were three blunt force

24   trauma wounds associated in the head area.

25   Sir, the Panel is going to make the following

26   recommendations to you and one, that you remain

27   **GARY LUTHER E-98605    DECISION PAGE 6    1/10/06**

52

1   disciplinary free, and that if it's possible,

2   get yourself updated educationally, and also

3   participate in self-help and with this, I'm

4   going to ask Commissioner Blonien if she had any

5   recommendations for you.

6          **DEPUTY COMMISSIONER BLONIEN:**   I was

7   trying to think of an analogy to talk to you, to

8   tell you what you need, but I'm just going to

9   say straight what you need.  You've got this

10  group of inmates out there that are your friends

11  and I don't know if any of them are lifers and

12  are going through this process.  If they are, I

13  think you should talk about the lifer process,

14  and you need to not -- if I was going to build a

15  house for you, and I would tell you it's going

16  to be done in a year, and you'd say well,

17  where's the written plan?  And I'd say well, I

18  don't have one.  I'm just going to build it.

19  And then you'd say well, do you have concrete

20  guy, and I'd say, no, but I'm going to find one.

21  We need definite.  We need to know that when you

22  get out, you're going to have support out there,

23  that the letters are current from your family,

24  cause you have wonderful letters, and I --

25  you're in touch with your family, they could

26  easily update and solidify your parole plan,

27  **GARY LUTHER E-98605    DECISION PAGE 7    1/10/06**

53

1  which has to include a solid component of help

2  for your alcohol and drug problems that you had

3  in the past.  You just saying, it's never going

4  to happen again, is not enough.  It may be

5  enough for you, but it's not enough for the

6  community that you're going to parole into.  And

7  you can do all that because you have all of that

8  available to you, and I hope you do it, and come

9  much better prepared to the Hearing so that this

10  hard work that you are doing and the

11  accomplishments that you are making every day,

12  benefit you.  So, I wish you good luck.

13          **PRESIDING COMMISSIONER GARNER:**  Okay.

14  The time is now 12:12 p.m. and that concludes

15  this Hearing.

16                  --oOo--

17

18

19

20

21

22

23  **PAROLE DENIED TWO YEARS**

24  **THIS DECISION WILL BE FINAL ON:  05/10/2006**

25  **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **GARY LUTHER E-98605    DECISION PAGE 8    1/10/06**

54

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, P. M. LaCHAPELLE, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 53, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF GARY LUTHER, CDC NO. E-98605, ON JANUARY 10, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated January 21, 2006, at Sacramento, California.

*P. M. LaChapelle*

P. M. LaCHAPELLE
TRANSCRIBER
**PETERS SHORTHAND REPORTING**