FILED

2009 APR -7 AM 10: 11

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST OF CA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GARY LUTHER,                                No. C 07-4214 MHP (pr)

　　　　Petitioner,                        **ORDER DENYING HABEAS PETITION**

　　v.

BEN CURRY, warden,

　　　　Respondent.
_____/

**INTRODUCTION**

　　　　Gary Luther, an inmate at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition will be denied.

**BACKGROUND**

　　　　Luther was convicted in Kern County Superior Court of second degree murder and was found to have used a firearm in the commitment of the offense. He was sentenced to 18 years to life in prison in 1991. His habeas petition does not challenge his conviction but instead challenges a January 10, 2006 decision of the Board of Parole Hearings ("BPH") that had found him not suitable for parole.

　　　　The BPH identified the circumstances of the commitment offense, his unstable social history, his limited programming in prison and need for self-help therapy as the reasons for its decision that Luther's release would pose an unreasonable risk of danger to society or

United States District Court
For the Northern District of California

1 threat to public safety. The BPH also noted that he needed to obtain more current parole
2 support letters for future hearings. The specifics of the crime and the circumstances
3 supporting the finding of unsuitability are described later in this order.

4     Luther sought relief in the California courts. The Kern County Superior Court denied
5 his petition for writ of habeas corpus in a reasoned decision. The California Court of Appeal
6 denied his petition for writ of habeas corpus in a two-sentence order. The California
7 Supreme Court summarily denied his petition for review.

8     Luther then filed his federal petition for a writ of habeas corpus. The court found
9 cognizable his claim that the evidence was insufficient to support the BPH's decision. The
10 court ordered respondent to show cause why the writ should not issue on that claim.
11 Respondent filed an answer and Luther filed a traverse. The matter is now ready for a
12 decision on the merits.

13                          **JURISDICTION AND VENUE**

14     This court has subject matter jurisdiction over this habeas action for relief under 28
15 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged
16 action concerns the execution of the sentence of a prisoner housed at a prison in Monterey
17 County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

18                                **EXHAUSTION**

19     Prisoners in state custody who wish to challenge collaterally in federal habeas
20 proceedings either the fact or length of their confinement are required first to exhaust state
21 judicial remedies, either on direct appeal or through collateral proceedings, by presenting the
22 highest state court available with a fair opportunity to rule on the merits of each and every
23 claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not
24 dispute that state court remedies were exhausted for the claim asserted in the petition.

25                            **STANDARD OF REVIEW**

26     This court may entertain a petition for writ of habeas corpus "in behalf of a person in
27 custody pursuant to the judgment of a State court only on the ground that he is in custody in
28 violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

1   The petition may not be granted with respect to any claim that was adjudicated on the merits

2   in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that

3   was contrary to, or involved an unreasonable application of, clearly established Federal law,

4   as determined by the Supreme Court of the United States; or (2) resulted in a decision that

5   was based on an unreasonable determination of the facts in light of the evidence presented in

6   the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S.

7   362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner

8   challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d

9   1123, 1126-27 (9th Cir. 2006).

10                          **DISCUSSION**

11   A.     Due Process Requires That Some Evidence Support a Parole Denial

12        A California prisoner with a sentence of a term of years to life with the possibility of

13   parole has a protected liberty interest in release on parole and therefore a right to due process

14   in the parole suitability proceedings. See Sass, 461 F.3d at 1127-28; Board of Pardons v.

15   Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442

16   U.S. 1 (1979); Cal. Penal Code § 3041(b).

17        A parole board's decision satisfies the requirements of due process if "some evidence"

18   supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for

19   disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To

20   determine whether the some evidence standard is met 'does not require examination of the

21   entire record, independent assessment of the credibility of witnesses, or weighing of the

22   evidence. Instead, the relevant question is whether there is any evidence in the record that

23   could support the conclusion reached'" by the BPH. Sass, 461 F.3d at 1128 (quoting

24   Superintendent v. Hill, 472 U.S. at 455-56). The "some evidence standard is minimal, and

25   assures that 'the record is not so devoid of evidence that the findings of the . . . board were

26   without support or otherwise arbitrary.'" Id. at 1129 (quoting Superintendent v. Hill, 472

27   U.S. at 457). The some evidence standard of Superintendent v. Hill is clearly established law

28   in the parole context for purposes of § 2254(d). Sass, 461 F.3d at 1129. As a matter of state

1  law, the decisionmaker's decision must also satisfy the "some evidence" standard of review.

2  See In re Lawrence, 44 Cal. 4th 1181, 1191 (Cal. 2008) (state court "standard of review

3  properly is characterized as whether 'some evidence' supports the conclusion that the inmate

4  is unsuitable for parole because he or she currently is dangerous").

5  Having determined that there is a due process right, and that some evidence is the

6  evidentiary standard for judicial review, the next step is to look to state law because that sets

7  the criteria to which the some evidence standard applies. One must look to state law to

8  answer the question, "'some evidence' of what?"

9  B.   State Law Standards For Parole For Murderers In California

10  California uses indeterminate sentences for most non-capital murderers, with the term

11  being life imprisonment and parole eligibility after a certain minimum number of years. A

12  first degree murder conviction yields a minimum term of 25 years to life and a second degree

13  murder conviction yields a minimum term of 15 years to life imprisonment. See In re

14  Dannenberg, 34 Cal. 4th 1061, 1078 (Cal.), cert. denied, 126 S. Ct. 92 (2005); Cal. Penal

15  Code § 190. The upshot of California's parole scheme described below is that a release date

16  normally must be set unless various factors exist, but the "unless" qualifier is substantial.

17  A BPH panel meets with an inmate one year before the prisoner's minimum eligible

18  release date "and shall normally set a parole release date. . . . The release date shall be set in a

19  manner that will provide uniform terms for offenses of similar gravity and magnitude in

20  respect to their threat to the public, and that will comply with the sentencing rules that the

21  Judicial Council may issue and any sentencing information relevant to the setting of parole

22  release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the

23  panel "shall set a release date unless it determines that the gravity of the current convicted

24  offense or offenses, or the timing and gravity of current or past convicted offense or offenses,

25  is such that consideration of the public safety requires a more lengthy period of incarceration

26  for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal.

27  Penal Code § 3041(b).

28  One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole

4

1   date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A
2   parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A
3   parole date set under this article shall be set in a manner that provides uniform terms for
4   offenses of similar gravity and magnitude with respect to the threat to the public."[1] The
5   regulation also provides that "[t]he panel shall first determine whether the life prisoner is
6   suitable for release on parole. Regardless of the length of time served, a life prisoner shall be
7   found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose
8   an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. §
9   2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal.
10  Code Regs. § 2402(b).

11         The regulations contain a matrix of suggested base terms for several categories of
12  crimes. See 15 Cal. Code Regs. § 2403. For example, for second degree murders, the matrix
13  of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years,
14  depending on some of the facts of the crime. Some prisoners estimate their time to serve
15  based only on the matrix. However, going straight to the matrix to calculate the sentence
16  puts the cart before the horse because it ignores critical language in the relevant statute and
17  regulations that requires him first to be found suitable for parole. The statutory scheme
18  places individual suitability for parole above a prisoner's expectancy in early setting of a
19  fixed date designed to ensure term uniformity. Dannenberg, 34 Cal. 4th at 1070-71. Under
20  state law, the matrix is not reached unless and until the prisoner is found suitable for parole.
21  Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he panel shall set a base term for each life
22  prisoner who is found suitable for parole").

23         The "Penal Code and corresponding regulations establish that the fundamental
24  consideration in parole decisions is public safety . . . [T]he core determination of 'public
25  safety under the statute and corresponding regulations involves an assessment of an inmate's
26  current dangerousness." Lawrence, 44 Cal. 4th at 1205 (emphasis in source).[2]

27         A critical issue in parole denial cases concerns the parole authority's use of evidence
28  about the murder that led to the conviction. Three Ninth Circuit cases provide the guideposts

5

for applying the Superintendent v. Hill some evidence standard on this point: Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons v. Carey, 505 F.3d 846 (9th Cir. 2007).[3] Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916. Next came Sass, which criticized the Biggs statements as improper and beyond the scope of the dispute before the court: "Under AEDPA it is not our function to speculate about how future parole hearings could proceed." Sass, 461 F.3d at 1129. Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability. See id. (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). Sass also put to rest any idea from Biggs that the commitment crime and pre-offense behavior only support the initial denial of parole. Irons determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence. Irons emphasized that all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." Irons, 505 F.3d at 853. Interpreting this statement from Irons to suggest that the

6

1  offense can only be relied on until the minimum number of years has been reached would

2  suffer the same problem that Sass identified in Biggs: it is not the holding of the case. The

3  dicta in Biggs and Irons are speculative and do not determine when a denial of parole based

4  solely upon the commitment offense or pre-offense behavior violates due process. Neither

5  logic nor Irons compel a decision that such reliance must cease when the prisoner reaches the

6  minimum number of years in his sentence, such as the fifteenth year of a 15-to-life sentence.

7  The upshot of these three cases is that the BPH can look at immutable events, such as

8  the nature of the conviction offense and pre-conviction criminality, to predict that the

9  prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight

10  to be attributed to those immutable events should decrease over time as a predictor of future

11  dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs and

12  Irons). Sass did not dispute the principle that, other things being equal, a murder committed

13  50 years ago is less probative of a prisoner's current dangerousness than one committed 10

14  years ago. Not only does the passage of time in prison count for something, exemplary

15  behavior and rehabilitation in prison count for something according to Biggs and Irons.

16  Superintendent v. Hill's standard might be quite low, but it does require that the decision not

17  be arbitrary, and reliance on only the facts of the crime might eventually make for an

18  arbitrary decision.[4]

19  C.  Some Evidence Supports The BPH's Decision In Luther's Case

20    1.  BPH Decision

21  The BPH identified the circumstances of the commitment offense, Luther's unstable

22  social history, his limited programming in prison and need for self-help therapy as the

23  reasons for its decision that Luther's release would pose an unreasonable risk of danger to

24  society or threat to public safety. The BPH also urged him to update his parole support

25  letters and plans, although it did not appear to rely on this as a reason to deny parole.

26    a.  Commitment Offense

27  Luther and his girlfriend, Tesha Hill, were friends with the victim, James William

28  Obert, who sometimes visited them at their home. Resp. Exh. A (Cal. Ct. App. Opinion

7

1   affirming conviction), p. 2. After the relationship between Luther and Hill ended, Hill
2   moved out of Luther's home. Luther began accusing Obert of having a relationship with her,
3   and stated on several occasions that Obert would pay for breaking up the couple. Luther
4   also owed Obert $200. for methamphetamine. See Resp. Exh. C, p. 1.

5       The murder occurred at about 5:00 p.m. on December 24, 1990 in Oildale, California.
6   CHP officer Taggart responded to a call for assistance. When he arrived at the residence, he
7   contacted Luther, who advised that he had hit Obert with a gun and then put the gun outside
8   on a shelf. Luther stated to a Kern County deputy sheriff that, "while lying on his bed, victim
9   Obert arrived at the residence uninvited. Luther grabbed the gun that he had had for
10  approximately nine years, showed the victim the gun and told him to get out. Luther advised
11  that the victim Obert charged him in a combative manner and, to defend himself, he struck
12  Obert with the gun. He indicated Obert fell to the floor and he called 911 for emergency."
13  Resp. Exh. C, p. 1; Resp. Exh. E, RT 8-9. He was taken to the sheriff's department for
14  questioning. Although he declined to waive his rights, "he made the statement to the deputy
15  that victim Obert 'bought my wife with drugs.' While in custody, he requested to go outside
16  for fresh air as he had drank a pint of Peppermint Schnapps just prior to the incident and
17  needed fresh air. He was allowed to go outside, in the company of the deputy, then returned
18  into the interview room where he fell asleep until the arrival of investigating detectives. He
19  then made unsolicited statements to the detectives such as 'it was an accident. All I did was
20  hit him with the gun. I didn't shoot him. I slapped him.' 'I didn't like the guy. He's been
21  fucking with my girlfriend, Tesha Hill.'" Resp. Exh. C.

22      Although Luther chose not to speak about the murder at the 2006 hearing, his version
23  for the 2001 board report was that the victim entered his bedroom and he told him to leave.
24  The victim went out to the living room, Luther obtained his gun, and the victim walked back
25  into the bedroom and advanced toward Luther. "Luther claims to have struck the victim
26  across the face with an open hand while holding the gun, then grasped the gun. 'That's when
27  the gun went off.'" Resp. Exh. C.

28      At Luther's trial, the doctor who did the autopsy "testified that the cause of death was

8

1 a gunshot wound that entered Obert's body in the back, right side of the neck above the
2 hairline. Besides the gunshot wound, Obert suffered three other injuries. These injuries
3 were caused by blunt force trauma. One was located on the right side of the face, another in
4 the front of the face and a third caused bruising to the left eye. The gunshot did not leave any
5 residue or tattooing on the body as would have been the case if the gun had been fired from a
6 very close distance." Resp. Exh. A (Cal. Ct. App. Opinion affirming conviction), p. 5. A
7 ballistics expert testified that the gun was fired from more than a foot away from the body.
8 Id. As the state court of appeal explained in affirming the conviction, "if the jury believed
9 the shooting was accidental, it would have acquitted Luther of all charges." Id. at 11.

10     The BPH determined that the commitment offense was carried out in an especially
11 cruel manner and demonstrated an exceptionally callous disregard for human suffering in that
12 the victim was shot in the head and had three blunt force trauma wounds to the head. RT 46.
13 The BPH concluded that the motive was trivial in that it apparently was related to a drug debt
14 or the drug culture. RT 46.

15         b.   Unstable Social History

16     The BPH also relied on Luther's unstable social history to deny parole. RT 48. As the
17 BPH explained, Luther had some criminal activity before the murder that it described as
18 "minor in nature" but that did involve the use of alcohol. Also, there was some instability in
19 his social history associated with drugs and alcohol.

20     There was ample support for reliance on this circumstance. Luther had been arrested
21 for driving under the influence in 1978 when he was 18 years old and was acquitted. RT 13.
22 He also had a conviction for driving under the influence in January 1989 and he had another
23 conviction for driving under the influence in April 1989. RT 13. In June 1989, he was
24 arrested for an unidentified Vehicle Code violation, although no disposition of that offense is
25 noted in the record. (The BPH didn't mention it, but his 2001 Board Report states that he
26 also was arrested between the 1978 acquittal and the 1989 DUI convictions for a separate
27 event of fighting in public and battery, and was "convicted of fight/noise/offensive words
28 and the battery was dismissed." Resp. Exh. C, pp. 3-4.) In addition to contributing to his

9

1 criminal record, drugs and alcohol played a part in the murder, as reflected in several
2 statements made by Luther at the time of the offense. He owed the victim $200 for
3 methamphetamine and thought the victim might be at his home to collect that debt. He told
4 different stories as to the amount of alcohol he had consumed on the day of the murder
5 ranging from consuming some drinks with friends to consuming a pint of peppermint
6 schnapps, and had smoked marijuana that day. He smoked marijuana about three times per
7 week, and had used cocaine occasionally and "crank" for 3-6 months. RT 15-16.

8                          c.      Need For Additional Programming

9        A third reason identified by the BPH for its decision to find Luther unsuitable for
10 parole was his limited programming for the amount of time he had been in custody and his
11 need for further programming, especially self-help programs. RT 48. One of the
12 commissioners stated that "the Panel concluded that you need some therapy in order to face,
13 discuss and understand and cope with stress in a non-destructive manner, and until some
14 progress is made, that you continue to be unpredictable and a threat to others." RT 50.

15       There was support for this determination in the record. The BPH noted that Luther
16 had a lot of positives in his institutional history, including that he had great reviews of his
17 work, he had obtained a certificate in lead paint abatement, he had no CDC-115 disciplinary
18 write-ups in his entire time in prison, and he had a very favorable psychological evaluation.
19 However, the BPH was concerned about his programming to address criminality and its
20 precursors. Luther had stopped going to Alcoholics Anonymous in 2002, and apparently was
21 relying on Bible study and willpower to address his substance abuse problem. RT 26-27, 29.
22 His church and religious studies efforts were not ignored by the BPH, but simply noted to be
23 (like AA) tools to deal with the inevitable stresses of life. RT 28.  At the last parole hearing
24 in April 2002, it was recommended that Luther attend self-help and therapy if available. RT
25 23. He had stopped AA in 2002 and currently did nothing besides religious studies for self-
26 help, other than exercise. RT 28. He did not know of a specific church he wanted to go to if
27 released. RT 30.

28

                                              10

1     2.    State Court Decision

2        The Kern County Superior Court rejected Luther's habeas petition in a reasoned

3 decision. See Resp. Exh. F. Although there were some factors favorable to Luther, but there

4 was sufficient evidence to support the BPH's decision that Luther's release would pose an

5 unreasonable risk of danger to society at this time.

6         The Board's decision was supported by some evidence. The Board found that
        Petitioner's commitment offense indicated unsuitability for parole. The Board found
7         that the offense was carried out in an especially cruel manner. The Board found that
        the offense was carried out in a manner which demonstrated an exceptionally callous
8         disregard for human suffering in that the victim was found to have had sustained one
        gunshot wound to the head and three blunt force trauma wounds to the head. The
9         Board found that Petitioner's motive for the crime was very trivial in relation to the
        offense. Petitioner owed a drug dealer money and he was concerned about that. The
10       Board found that petitioner's unstable social history associated with drugs and alcohol
        indicated unsuitability for parole. With respect to Petitioner's institutional behavior,
11       the Board found that Petitioner had programmed in a limited manner considering the
        amount of time Petitioner had been in. The Board was also concerned that Petitioner
12       failed to upgrade himself educationally and that he had not sufficiently participated in
        self-help programs. The Board concluded that Petitioner need[ed] some therapy in
13       order to face, discuss, and understand and cope with stress in a non-destructive
        manner.
14

15 Resp. Exh. F., pp. 1-2. That court also rejected the argument that the Board could not

16 continue to rely on the fact of the criminal offense, noting that such reliance was allowed

17 under California law and Ninth Circuit's statement in Biggs to the contrary was dicta. Resp.

18 Exh. F, p. 2. The Kern County Superior Court used the proper "some evidence" standard as

19 the standard for judicial review of the decision.

20        Because the Kern County Superior Court's decision is the last reasoned decision, that

21 is the decision to which § 2254(d) applies. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04

22 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005), cert. denied, 126 S. Ct.

23 2041 (2006). The state court did not unreasonably apply Superintendent v. Hill.

24     3.    Analysis Of Federal Claim

25        The BPH had considered circumstances and factors proper under California law. A

26 circumstance tending to indicate unsuitability for parole is that "the prisoner committed the

27 offense in an especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. §

28 2402(c)(1). Shooting someone in the back of the head qualifies. See id. at § 2402(c)(1)(B).

as especially cruel. Another circumstance weighing against a finding of suitability for parole is an unstable social history. Id. at § 2402(c)(3). The need for further programming is not specifically listed as a circumstance tending to indicate unsuitability under § 2402(c), but may be considered under § 2402(b), which provides that "[a]ll relevant, reliable information available to the panel shall be considered in determining suitability for parole." Also, the need for further programming could be viewed as a deficiency in institutional activities that indicate an enhanced ability to function within the law upon release – a circumstance that tends to indicate suitability for parole. See 15 Cal. Code Regs. § 2402(d)(9). The BPH's ultimate conclusion was cast in terms of the requirement of California law, i.e., that Luther was not suitable for parole and "would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." RT 46; see Lawrence, 44 Cal. 4th at 1191.

This was not a case in which the BPH relied solely on the commitment offense or even just on pre-commitment factors. The BPH relied on the commitment offense and the unstable social history but also on the need for further self-help programming. This was a situation where the interrelatedness of the three reasons made the BPH wary of paroling this particular inmate. There were significant drug/alcohol concerns for Luther, as he had two DUI convictions in the years before the murder, he had consumed at least some alcohol (even if the amount is in dispute) and had smoked marijuana on the day he killed the victim. He also reported that he owed the victim $200 for methamphetamine when the victim came to his home that day. Notwithstanding the indicators of a significant substance abuse concern for the inmate, the inmate had not really immersed himself in efforts to address that substance abuse concern. Indeed, the colloquy at the parole hearing shows Luther noticeably trying to steer the conversation away from discussion of his efforts to address alcohol and drug abuse concerns. See RT 26-29. He was rather adamant that his religious studies and willpower would save him, yet did not articulate any particular way in which that would occur. At the end of the hearing a BPH commissioner made comments that reflected that the panel's unease at the lack of "a solid component of help for your alcohol and drug problems that you had in the past. You just saying, it's never going to happen again, is not enough."

12

1   RT 53.

2   Luther disputes the accuracy of some of the facts about the commitment offense.
3   However, none of his assertions rise to the level of indicating that the BPH's decision lacked
4   evidentiary support. The BPH was not required to believe his version of the killing –
5   especially since his accidental shooting story was inconsistent with the second degree murder
6   conviction. As the California Court of Appeal explained in affirming his conviction, the
7   jury's verdict rejected his contention that the shooting was accidental. Resp. Exh. B, p. 11.
8   Luther's story of an accidental discharge of the gun when he hit Obert in the head with the
9   gun as Obert charged at him also was not credible in light of the autopsy finding that Obert
10  was shot in the back of the head and the expert testimony that Obert was shot when the gun
11  was more than a foot away from his body. Luther urges that the trial court made a finding
12  that this was not an execution-style murder, but he offers no evidence of that finding; even if
13  the finding had been made, there is no evidence that such a finding was known to the BPH
14  when it made its decision. Finally, Luther chose not to discuss his commitment offense at his
15  parole hearing. He was within his rights to so choose, but his arguments now about his
16  version of the offense are of limited value because the courts review the evidence that the
17  BPH had when it made its decision and not arguments Luther offers after the fact.

18  The BPH recognized that there was much to be commended about Luther's
19  performance in prison. However, notwithstanding all the positive factors for Luther, the
20  BPH determined that, 15 years into his 18-to-life sentence, the murder plus Luther's unstable
21  social history and inadequate self-help programming showed that he posed an unreasonable
22  risk of danger to society if released from prison. Significantly, Luther had not yet served the
23  minimum number of calendar years required by his sentence. See Irons, 505 F.3d at 853.
24  The BPH did not act arbitrarily or capriciously or without some evidentiary support in
25  determining that Luther currently presented an unreasonable risk of danger to society if
26  released from prison. Bearing in mind that the court's chore is to consider not whether some
27  evidence supports the reasons, but whether some evidence supports the conclusion that
28  Luther's release unreasonably endangers public safety, this court concludes that there was

13

Case 3:07-cv-04214-MHP   Document 5   Filed 04/07/09   Page 14 of 16

1   some evidence to support the BPH's conclusion.   The Kern County Superior Court's

2   rejection of his insufficient evidence claim was not contrary to or an unreasonable

3   application of the Superintendent v. Hill some evidence standard.  Luther is not entitled to

4   the writ.

5                                          **CONCLUSION**

6          For the foregoing reasons, the petition is denied on the merits. The clerk shall close

7   the file.

8          IT IS SO ORDERED.

9   DATED: April 6, 2009

10                                          Marilyn Hall Patel
                                           United States District Judge

14

1

# NOTES

2

3   1.      The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the

4   prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense;

5   and negative institutional behavior. 15 Cal. Code Regs. § 2402(c). The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social

6   history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the

7   probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior. 15 Cal. Code Regs. § 2402(d).

8

9   2.      The California Supreme Court's determination in <u>Lawrence</u>, 44 Cal. 4th 1181, that state law requires the parole authority to determine whether the inmate is unsuitable for parole because he currently is dangerous is binding in this federal habeas action. <u>See</u> <u>Hicks v.</u>

10  <u>Feiock</u>, 485 U.S. 624, 629-30 (1988). However, <u>Lawrence</u> does not govern this court's analysis in every respect. This court is not bound by the discussion in <u>Lawrence</u>

11  (<u>see</u> footnote 4, <u>infra</u>) as to the evaluation of the commitment offense in determining whether the parole applicant currently is dangerous. As to that point, <u>Lawrence</u> is persuasive

12  authority, while the Ninth Circuit's holdings in <u>Sass, Biggs</u>, and <u>Irons</u> are binding authority. Also, <u>Lawrence</u>'s determination that "some evidence" is the proper standard of judicial

13  review, 44 Cal. 4th at 1211-12, does not bind this court because it is a state court decision and, in any event, was not determining the standard required by the federal constitution.

14

15  3.      <u>En banc</u> review is now pending in a fourth case regarding the some evidence standard, <u>Hayward v. Marshall</u>, 512 F.3d 536 (9th Cir.), <u>reh'g en banc granted</u>, 527 F.3d 797 (9th Cir.

16  2008). The order granting <u>en banc</u> review states that the panel opinion is of no precedential value.

17  4.      The California Supreme Court discussed the use of the commitment crime to deny parole in the companion cases of <u>Lawrence</u>, 44 Cal. 4th 1181, and <u>In re Shaputis</u>, 44

18  Cal. 4th 1241 (Cal. 2008). The court explained that where "evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is

19  overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating

20  the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' <u>inevitably</u> supporting the

21  ultimate decision that the inmate remains a threat to public safety." <u>Lawrence</u>, 44 Cal. 4th at 1191 (emphasis in source). Applying that rule, the court determined that there was not some

22  evidence to deny parole in <u>Lawrence</u> but that there was some evidence to deny parole in <u>Shaputis</u>.

23

24

25

26

27

28

15

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

GARY B LUTHER,

        Plaintiff,

v.

BEN CURRY, warden,

        Defendant.

_____/

Case Number: CV07-04214 MHP

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on April 7, 2009, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Amanda Jane Murray
California Department of Justice
State Attorney General's Office
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102-7004

Gary B. Luther E-98605
Correctional Training Facility
P.O. Box 689
Soledad, CA 93960-0689

Dated: April 7, 2009

*Karen L. Hom*

Richard W. Wieking, Clerk
By: Karen Hom, Deputy Clerk